# EXHIBIT A-2

CAUSE NO.: _____ Insert text here

| | | |
|---|---|---|
| **MONICA M. GALLEGOS, Individually as Wrongful Death Beneficiary and as Representative of the Estate of A.G.R., deceased minor,** | § § § § § | **IN THE DISTRICT COURT** |
| **Plaintiff,** | § § | |
| **v.** | § § | **38TH JUDICIAL DISTRICT** |
| **DANIEL DEFENSE, LLC; DANIEL DEFENSE HOLDINGS, LLC; M.C. DANIEL GROUP, INC.; FIREQUEST INTERNATIONAL, INC.; FLASH CO., INC.; EOTECH, LLC; PROJECT ECHO HOLDINGS, LLC d/b/a AMERICAN HOLOPTICS; KOUCAR MANAGEMENT, LLC; and OASIS OUTBACK, LLC;** | § § § § § § § § § § § § § | |
| **Defendants.** | § | **UVALDE COUNTY, TEXAS** |

## <u>PLAINTIFF'S ORIGINAL PETITION</u>

1.    As of Tuesday morning, May 24, 2022 – before he took a Daniel Defense AR-15 to Robb Elementary School to carry out one of the deadliest school shootings in American history – there were few people who knew much about the slight teenager from Uvalde, Texas who, by the end of the day, would be forever known as the "the Uvalde Shooter."

2.    Abused as a child and bullied mercilessly in school, the Shooter had grown increasingly isolated in his teenage years. He was involuntarily withdrawn from high school at seventeen for failing grades and recurrent absences. He had few, if any, friends, and lived with his grandmother.

3.    Alienated from the real world, the Shooter retreated into a virtual, online one where he could be everything he felt he wasn't: confident, masculine, secure, and feared.

1

FILED
5/24/2024 6:07 PM
Christina Ovalle, District Clerk
Uvalde County, TX
By Kylie Sendejo

Copy from re:SearchTX

4.      And though the Shooter may have felt that this online world conferred anonymity, the opposite was true. Online, in the small town of Uvalde, the Shooter was being tracked, targeted, and courted by a firearm manufacturer 1,200 miles away in Georgia.

5.      That company, Daniel Defense, has perfected the art of indoctrinating a particular demographic: adolescents who are vulnerable to marketing that stokes their sense of aggrievement and desire for power; who can be courted exclusively online, behind the backs of parents, and groomed as future Daniel Defense customers.

6.      Among a litany of unconscionable tactics, Daniel Defense's marketing and sales scheme glamorizes fantasies of combat and revenge, refers to soldiers on patrol with its weapons as "hunters," and casually promotes its weapons for sniper missions on American streets. A local Georgia paper has written that if the company's advertising is a reflection of the company itself, Daniel Defense is "the sociopath next door."

7.      The explanation for this conduct is straightforward: Daniel Defense is in a niche business. It profits from one kind of weapon: the AR-15. The AR-15 is a battlefield weapon, developed to meet the United States military's needs in combat. It is a fearsome, efficient killing machine. Daniel Defense must sell AR-15s or perish; it *must* attract new users. And what better way to do so than to cultivate brand loyalty in teenagers before they turn 18, to hook and reel in a steady stream of new potential customers from the millions of teens scrolling Instagram and cosplaying soldier in Call of Duty.

8.      Daniel Defense harnesses and exploits the power of social media and first-person shooter simulations to lure teenagers to its website where it can monitor their online activity, build a profile of their interests, and solicit their contact information.

9.      Daniel Defense courted the Uvalde Shooter with a marketing and sales scheme it

2

Copy from re:SearchTX

had devised to lure him and other adolescents into a relationship with its brand of AR-15s, particularly its flagship DDM4v7. Daniel Defense's marketing and sales scheme spoke to the common struggles and insecurities of adolescent boys, promising to solve these problems with a Daniel Defense AR-15. It knew the importance of being the first gun company to develop a relationship with an adolescent who had never before purchased a firearm from Daniel Defense or its competitors. Daniel Defense spoke this message in an effort to drive adolescents to Daniel Defense's website, which lacked any form of even nominal age verification. Daniel Defense did this with the Uvalde Shooter, and it worked as intended.

10.     Through its DDM4v7, Daniel Defense promised power in place of the Uvalde Shooter's feelings of weakness; revenge in place of his feelings of aggrievement; glory in place of his feelings of anonymity; companionship in place of his feelings of isolation; masculinity in place of his feelings of inadequacy; and killing in place of his feelings of powerlessness.The Uvalde Shooter may have thought he had found his own way to Daniel Defense; but Daniel Defense led him there step by step. Driven by Daniel Defense's prolonged effort to develop a relationship with him, the seventeen-year-old Shooter visited Daniel Defense's website. He picked out his weapon and added it to his shopping cart. The weapon he picked was never in doubt. As promised by Daniel Defense, it could address all of his struggles. It was the DDM4v7.

Copy from re:SearchTX

11.     Here is that weapon on the floor of Robb Elementary:



12.     Although the Shooter added the DDM4v7 to his cart, he did not complete the purchase. And so, Daniel Defense took the final, culminating step in its long effort to court the Shooter. It emailed the Shooter a targeted offer to sell him the DDM4v7: "Hi Salvador, are you on the fence?" "Your DDM4v7 is ready in your cart!" The email contained a "RETURN TO CART" button that hyperlinked directly to the Shooter's shopping cart on Daniel Defense's website, so that the Shooter could simply click the button and complete his purchase.

13.     The Shooter was seventeen. That offer to sell was flatly illegal, and indeed a criminal offense under Texas law, which prohibits anyone from offering to sell a firearm to a minor under age eighteen.

14.     Just shy of three weeks later, and only twenty-three minutes after turning eighteen, the Shooter accepted the offer and paid for the weapon.

15.     The DDM4v7 is an AR-15. With slight modifications, the AR-15 has been the standard-issue military rifle for over 50 years. But the characteristics that make it the ideal rifle for the most powerful military on earth also make the AR-15 an ideal weapon for mass shootings

4

Copy from re:SearchTX

carried out by a lone gunman.

16.    It is obvious that Daniel Defense's marketing and sales strategy is not only likely, but certain to lead to mass shootings. But Daniel Defense is undeterred. Daniel Defense will not stop this illegal and wrongful conduct until it is finally held accountable for the lives lost and the wounds suffered as a result.

17.    The Plaintiff here is the mother of one of the nineteen children who died on May 24, 2022. She seeks nothing more and nothing less than full accountability for the indescribable harm Defendants have caused her.

## I.   DISCOVERY CONTROL PLAN

18.    Pursuant to Rule 190.4 of the Texas Rules of Civil Procedure, Plaintiff intends that discovery will be conducted under Level 3.

## II.  PARTIES

**A.    Plaintiff**

19.    Plaintiff Monica M. Gallegos brings claims Individually, as Wrongful Death Beneficiary, and as Representative of the Estate of A.G.R., her daughter, a deceased minor who was ten years old and in the fourth grade at Robb Elementary School on May 24, 2022. Monica M. Gallegos is a citizen of Texas, and A.G.R. was a resident of Texas. Pursuant to § 30.014 of the Texas Civil Practice and Remedies Code, the last three digits of Plaintiff's driver's license are 6, 4, 8; the last three digits of her Social Security Number are 9, 9, 2.

**B.    Defendants**

20.    Defendant Daniel Defense, LLC is a firearms manufacturer and a foreign limited liability company organized under the laws of the state of Georgia; it conducts business throughout the United States, including Texas, and its corporate headquarters and principal place of business

5

Copy from re:SearchTX

is located at 101 Warfighter Way, Black Creek, Georgia 31308. Daniel Defense does not maintain a registered agent for service of process in Texas and thus may be served through the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044, by sending this pleading to: Daniel Defense, LLC, 101 Warfighter Way, Black Creek, Georgia 31308 and to its registered agent in its state of organization (Georgia): Marvin Daniel, 101 Warfighter Way, Black Creek, Georgia 31308. Service is requested at this time.

21.    Defendant Daniel Defense Holdings, LLC is the sole member of Defendant Daniel Defense, LLC, and a foreign limited liability company organized under the laws of the state of Delaware; it conducts business throughout the United States, including Texas. Daniel Defense Holdings, LLC does not maintain a registered agent for service of process in Texas and thus may be served through the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044, by sending this pleading to its registered agent in its state of organization (Delaware): Daniel Defense Holdings, LLC c/o Advanced Corporate Agent Services, Inc., 614 N Dupont Hwy Suite 210, Dover, Delaware 19901; and to the corporate headquarters and principal place of business of its subsidiary: Daniel Defense Holdings, LLC c/o Daniel Defense, LLC, 101 Warfighter Way, Black Creek, Georgia 31308. Service is requested at this time. Daniel Defense Holdings, LLC's majority member is M.C. Daniel Group, Inc., a Georgia corporation. Daniel Defense Holdings, LLC's minority member is David Phelps, a citizen and resident of Texas.

22.    Defendant M.C. Daniel Group, Inc. is the majority member of Defendant Daniel Defense Holdings, LLC, and a foreign corporation organized under the laws of the state of Georgia; it conducts business throughout the United States, including Texas. M.C. Daniel Group,

6

Copy from re:SearchTX

Inc. does not maintain a registered agent for service of process in Texas and thus may be served through the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044 ,by sending this pleading to: M.C. Daniel Group, Inc., 107 Wild Turkey Lane, Pooler, Georgia 31322 and to its registered agent in its state of incorporation (Georgia), Marvin Daniel at 101 Warfighter Way, Black Creek, Georgia 31308. Service is requested at this time.

23.     Collectively, Defendants Daniel Defense, LLC; Daniel Defense Holdings, LLC; and M.C. Daniel Group, Inc. are referred to in this Petition as "Daniel Defense." Daniel Defense manufactures, markets, and sells AR-15s. Daniel Defense manufactured, marketed, and sold the AR-15-style DDM4v7 rifle used by a barely 18-year-old kid of no more than 140 pounds and 5'6" to slaughter, maim, and terrorize children and teachers for 77 minutes, and to hold down and paralyze 376 heavily armed police officers for 77 minutes, at Robb Elementary School on May 24, 2022.

24.     Defendant Firequest International, Inc. is a foreign corporation organized under the laws of the state of Arkansas that conducts business throughout the United States, including Texas. Firequest International, Inc. does not maintain a registered agent for service of process in Texas and thus may be served through the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044, by sending this pleading to: Firequest International, Inc., 505 East 5th St., El Dorado, Arkansas 71730 and to its registered agent in its state of incorporation (Arkansas): Lisa McCuistion, 505 East 5th St., El Dorado, Arkansas 71730. Service is requested at this time. Firequest International, Inc. manufactures firearms accessories, such as the Hell-Fire Gen 2 snap-on trigger system purchased by the Shooter, which allow semi-automatic rifles to fire more rapidly, similar to automatic

Copy from re:SearchTX

weapons. Upon information and belief, Firequest International, Inc. has an ownership stake in, and exercises control over, the domains firequest.com, hellfire.systems, rockinlock.com, and rapidfiretriggers.net.

25.     Defendant Flash Co., Inc. is a foreign corporation organized under the laws of the state of Colorado that conducts business throughout the United States, including Texas. Flash Co., Inc. does not appear to actively have a Texas Registered Agent for service in Texas and thus may be served through the office of the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044, by sending this pleading to: Flash Co., Inc., 236 S. 3rd St. PMB 206, Montrose, Colorado 81401 and to its registered agent in its state of incorporation (Colorado): Vincent Troncoso, 236 South 3rd St., Suite 206, Montrose, Colorado 81401. Service is requested at this time. Upon information and belief, Defendant Flash Co., Inc. has an ownership stake in, and exercises control over, the domains hellfire.systems, rockinlock.com, rapidfiretriggers.net, and firequest.com.

26.     At all relevant times, the websites for hellfire.systems and rapidfiretriggers.net listed Defendant Flash Co. Inc. as the contact point for visitors interested in purchasing Hell-Fire trigger systems. At all relevant times, rockinlock.com listed the phone number for Defendant Flash Co., Inc. as the contact point for visitors interested in purchasing a Hell-Fire Gen 2 snap-on trigger system. On the website hellfire.systems, Defendant Flash Co., Inc. claims to control "Hellfire.systems/ rockinlock.com/ rapidfiretriggers.net/ firequest.com". hellfire.systems directs customers to firequest.com for "special wholesale pricing". Collectively, defendants Firequest International, Inc. and Flash Co., Inc. are referred to in this Petition as "Firequest."

27.     Defendant EOTech, LLC is a foreign limited liability company organized under the laws of the state of Michigan that conducts business throughout the United States, including Texas.

8

Copy from re:SearchTX

EOTech, LLC does not maintain a registered agent for service of process in Texas and thus may be served through the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044, by sending this pleading to: EOTech, LLC, 46900 Port St., Plymouth, Michigan 48170 and to its registered agent in its state of organization (Michigan): Joseph Caradonna, 905 W. Maple Rd., Clawson, Michigan 48017. Service is requested at this time.

28.     Defendant Project Echo Holdings, LLC d/b/a American Holoptics is a foreign limited liability company organized under the laws of the state of Michigan that conducts business throughout the United States, including Texas. Project Echo Holdings, LLC is the parent company of EOTech, LLC. Project Echo Holdings, LLC does not maintain a registered agent for service of process in Texas and thus may be served through the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044, by sending this pleading to: Project Echo Holdings, LLC d/b/a American Holoptics, 905 W. Maple Rd., Clawson, Michigan 48017, and to its registered agent in its state of organization (Michigan): Joseph Caradonna, 905 W. Maple Rd., Clawson, Michigan 48017. Service is requested at this time.

29.     Defendant Koucar Management, LLC is a foreign limited liability company organized under the laws of the state of Michigan. Koucar Managment, LLC operates under the assumed names of Koucar Industries, Koucar International, and Koucar Worldwide. Koucar Management, LLC is the parent company of Project Echo Holdings, LLC d/b/a American Holoptics. Koucar Management, LLC does not maintain a registered agent for service of process in Texas and thus may be served through the Texas Secretary of State in accordance with Texas Business Organizations Code § 5.251 and/or Texas Civil Practice and Remedies Code § 17.044,

9

Copy from re:SearchTX

by sending this pleading to: Koucar Management, LLC d/b/a Koucar Industries, Koucar International and Koucar Worldwide, 905 W. Maple Road, Clawson, Michigan 48017 and to its registered agent in its state of organization (Michigan): Joseph Caradonna, 905 W. Maple Road, Clawson, Michigan 48017. Service is requested at this time.

30.     Collectively, Defendants EOTech, LLC, Project Echo Holdings, LLC, and Koucar Management, LLC are referred to in this Petition as "EOTech." EOTech manufactured, marketed, sold, and shipped a holographic battle sight to the Shooter in Texas.

31.     Defendant Oasis Outback, LLC ("Oasis Outback") is an outdoor outfitter and weapons retailer, and domestic limited liability company formed under the laws of the state of Texas. Its principal place of business is located at 2900 E. Main St. Uvalde, Texas 78801. Oasis Outback is a citizen of the state of Texas, and may be served with process by serving its registered agent at William R. Klein, 236 East Nopal Street, Uvalde, Texas 78801. Service will be by private process.

### III.     JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over this action because the amount sought herein exceeds the minimum jurisdictional limits of the Court. Pursuant to Rule 47(c) of the Texas Rules of Civil Procedure, Plaintiff seeks damages in excess of $1,000,000.00.

33.     Venue is proper in Uvalde County, Texas pursuant to §§ 15.002(a)(1), (3) of the Texas Civil Practice and Remedies Code because Uvalde County is the county in which all or a substantial part of the events and/or omissions giving rise to the claim occurred and because Uvalde County is the county of defendant Oasis Outback's principal place of business in this state. Venue is proper as to all of Plaintiff's claims against all Defendants under § 15.005 of the Texas Civil Practice and Remedies Code because all of Plaintiff's claims arise from the same transaction

10

Copy from re:SearchTX

or occurrence or series of transactions or occurrences.

34.    This Court has specific and/or general jurisdiction over all Defendants. This Court has general jurisdiction over Defendant Oasis Outback because it is a resident of Texas and is "at home" in Texas. The Court also has specific personal jurisdiction over all Defendants because they each purposefully availed themselves of the privilege of conducting business activities in Texas and purposefully directed their business activities to Texas, seeking economic benefit from engaging in commerce in Texas with Texas residents. Each of the Defendants has substantial and continuous contacts with the State of Texas generally and with respect to this action. Each of the Defendants is actively and purposefully engaged in selling products to the State of Texas and/or within the State of Texas and obtaining the benefits of transacting business in the State of Texas with residents and citizens of Texas. It was foreseeable to each Defendant that the purposeful direction of its commercial activities to the State of Texas would result in injuries to citizens or residents of Texas and in a lawsuit filed in the State of Texas. Indeed, as alleged herein, each Defendant engaged in tortious conduct and those torts either occurred in Texas or caused injury in Texas and each Defendant's liability for that tortious conduct arises directly and foreseeably from the direction of their activities to Texas. The exercise of personal jurisdiction over each Defendant by this Court is consistent with Due Process and does not offend traditional notions of fair play and substantial justice. The exercise of personal jurisdiction over each Defendant is authorized by the Texas Long Arm Statute (as expressed in Chapter 17 of the Texas Civil Practice and Remedies Code.

35.    Although Plaintiff seeks damages in an amount exceeding $75,000, federal courts lack jurisdiction over this suit. Plaintiff seeks no relief under federal law, statute, regulation, treaty, or constitution, nor do Plaintiff's rights to relief necessarily depend on the resolution of a

11

Copy from re:SearchTX

substantial question of federal law. In addition, there is not complete diversity of citizenship between Plaintiff and all defendants, which precludes removal of this action to federal court. To the extent Defendants seek to remove this case to federal court, Plaintiff requests an award of all costs, expenses, and fees available under 28 U.S.C. § 1447(c).

## IV.    CONDITIONS PRECEDENT

36.    Pursuant to Rule 54 of the Texas Rules of Civil Procedure, all conditions precedent have been performed, have occurred, and/or have been waived, such that every notice required by law to be given has properly and timely been given to Defendants.

## V.  THE AR-15 IS A BATTLE RIFLE

> *"He has a battle rifle!"*
>
> *—Police officer describing the Shooter's AR-15 at the scene of the active shooting at Robb Elementary School*

37.    The AR-15 is a weapon perfected to fill the United States military's need for maximum lethality in a lightweight, easy-to-use design.

38.    In the years after World War II, the military realized that it needed a new weapon for the modern battlefield. Rather than the trench warfare of past conflicts, modern battlefields – from Korea to Vietnam and on – would be fought in faster terrain, and at variable ranges, from the close quarters of urban combat to the wider expanses of jungles and deserts.

39.    The U.S. Army's Operations Research Office envisioned a new weapon that could "increase in both number and rate the hits which may be inflicted," as well as the "mortality of wounds caused by these hits."

40.    The Army invited Eugene Stoner, the chief designer at a small firearms manufacturer, ArmaLite, to produce a lightweight, high-velocity rifle, that could operate in both semi- and full-automatic modes with firepower capable of producing devasting wounds and

12

Copy from re:SearchTX

penetrating body armor at significant distances. In the late 1950s, Stoner devised the ArmaLite Rifle-15 (AR-15) to meet these specifications.

41.     Today, the weapon is referred to interchangeably as "AR-15," "AR-15 Type," and "AR-15 Style." It is also often referred to as an "assault rifle" or "combat rifle," terms that perfectly describe the intent for which it was designed and the rationale for its existence.

42.     Among the deadliest of the AR-15's innovations was its combination of a smaller caliber bullet with dramatically increased muzzle velocity – the speed a bullet possesses at the moment it leaves the muzzle of a firearm. Higher muzzle velocity increases the size and severity of bullet wounds, the effective range, and the likelihood that bullets will pierce body armor, walls, and other barriers. A study by physicians who performed autopsies on soldiers killed by gunfire in Iraq found that rounds with a velocity exceeding 2,500 feet per second cause a shockwave to pass through the body upon impact that results in catastrophic injuries even in areas remote to the direct wound, often causing large, lethal wounds upon impact with virtually any part of the body. AR-15s are capable producing muzzle velocities of 4,000 feet per second – more than three times the speed of sound.

43.     The day after the shooting at Uvalde, Police Department Lt. Javier Martinez described the terrifying threat posed by the Shooter's Daniel Defense AR-15: "Had anybody gone through that door, [the Shooter] would have killed whoever it was." An officer "can only carry so many ballistic vests on you. That .223 (caliber) round would have gone right through you."

44.     It is perhaps unsurprising that increased muzzle velocity equates to increased lethality. But what is counterintuitive is that at the exceedingly high muzzle velocities produced by the AR-15, smaller caliber bullets can actually be more catastrophically deadly than slower, larger bullets.

13

Copy from re:SearchTX

45.     The AR-15 was designed to fire .223 inch caliber rounds (or their functional equivalent, 5.56 millimeter rounds). This was a significant decrease in bullet size from the AR-15's military predecessors, such as the .30 caliber round fired by the M1 rifle.

46.     Larger caliber bullets are more stable. They generally retain that stability when they enter flesh, tracing a straighter, more direct course through the body. But the smaller rounds fired by the AR-15 are inherently more unstable once they impact the body. They tumble through the body on a tortuous course through flesh, muscle, bone, and organs. When combined with the astronomical muzzle velocities produced by the AR-15, the effect is often – depending on the point of impact – decapitation or evisceration.

47.     On top of this, AR-15 rifles are also designed to accommodate large-capacity magazines and fire rounds in rapid succession. The military wanted large capacity magazines to increase the firepower of infantry units by minimizing time spent reloading.

48.     The AR-15's compatibility with detachable, high-capacity magazines means that soldiers can go through many rounds without having to do anything other than pull a trigger and, once a magazine is empty, swap in a new magazine.

49.     Fully automatic fire from an AR-15-style rifle can empty a 30-round magazine in approximately two seconds. Semiautomatic fire from an AR-15-style rifle fire can empty the same 30-round magazine in approximately five to ten seconds.

50.     The rifles and carbines carried by U.S. servicemembers are capable of both fully automatic and semiautomatic fire. However, the United States Army considers semiautomatic fire more effective than automatic fire in many combat situations.

51.     The net effect of high muzzle velocity, compatibility with high-capacity magazines, and rapid, semiautomatic fire is more wounds, of greater severity, in more victims, in less time.

14

Copy from re:SearchTX

52.     These design features maximize the lethal power of a lone gunman.

## A.     The Proving Grounds of Vietnam

53.     And so, in theory at least, the AR-15 produced by Stoner in the late 1950s fit exactly what the military was looking for. But what about in practice? The growing war in Vietnam provided ideal conditions in which to test the lethality of the AR-15 in the exact combat scenarios for which it was developed.

54.     In 1962, the military undertook a "comprehensive field evaluation" of the AR-15 "under combat conditions in Vietnam." It armed South Vietnamese soldiers with AR-15s to test the new weapon's effectiveness in combat with the Viet Cong. Based on this combat testing, the military produced a confidential report – now declassified – assessing the performance of the AR-15.

55.     The AR-15 was an unequivocal success – a far superior and far more deadly combat rifle than anything ever invented.

56.     The report praised the stunning lethality of the AR-15, describing horrific wounds inflicted by the rifle. The report described how "[a]t a distance of approximately 15 meters, one Ranger fired an AR-15 full-automatic hitting one VC [(Viet Cong)] with 3 rounds with the first burst. One round in the head took it completely off. Another in the right arm, took it completely off, too. One round hit him in the right side, causing a hole about five inches in diameter. It cannot be determined which round killed the VC but it can be assumed that any one of the three would have caused death."

57.     In another battle, a Ranger platoon attacked a Viet Cong company. The Report described the ensuing carnage:

        Number of VC killed: 5
        Number of AR-15s employed: 5

15

Range of engagement: 30-100 meters
Type wounds:
1. Back wound, which caused the thoracic cavity to explode.
2. Stomach wound, which caused the abdominal cavity to explode.
3. Buttock wound, which destroyed all tissue of both buttocks.
4. Chest wound from right to left, destroyed the thoracic cavity.
5. Heel wound, the projectile entered the bottom of the right foot causing the leg to split from the foot to the hip.

These deaths were inflicted by the AR-I5 and all were instantaneous

58.    In one special forces raid, two Viet Cong were killed by AR-15 fire. "One man was hit in the head; it looked like it exploded. A second man was hit in the chest, his back was one big hole."

59.    In another battle, "Five VC were hit, all five with body wounds, and all five killed. Four were probably killing wounds with any weapon listed, but the fifth was essentially a flesh wound. The AR-15 made it a fatal wound."

60.    But the AR-15 is not just technically superior to any other battle rifle; it makes its bearer *feel more deadly and more confident*. The 1962 report found that soldiers armed with AR-15s were "very enthusiastic about the weapon," had "great confidence in it" as a killing machine, and "prefer it to all others." One unit commander of an Airborne Brigade praised the AR-15 for a "tremendous psychological uplift in the individual soldier's belief in his ability to shoot and kill."

61.    For all these reasons, the Army adopted the AR-15 in December 1963, renaming it the M16. In later years, the Army would replace the M16 with updated versions, including the M16A1 and M16A2, as well as shorter, carbine versions such as the M4 and M4A1. Even to this day, the AR-15 platform is the bedrock assault rifle for America's armed forces.

16

Copy from re:SearchTX

**B.      The Battle Rifle of The American School Shooter**

62.      The AR-15 is also the bedrock assault rifle for America's school shooters.

63.      Uvalde, Texas; Parkland, Florida; and Newtown, Connecticut – three small towns and the three deadliest K-12 school shootings in American history. All three were carried out by an isolated, troubled, boy under the age of twenty-one, who played the Call of Duty franchise of first-person-shooter video games, and who used the AR-15 as his weapon.

64.      The 1962 report foreshadowed – albeit unknowingly – the terrible use to which the AR-15 would be put in America's schools.

65.      The 1962 report evaluated the test-case of South Vietnamese soldiers using the AR-15 to kill and maim North-Vietnamese soldiers. According to the 1962 report, the average Vietnamese soldier at the time was five feet tall and weighed 90 pounds. In other words, the AR-15 was tested for use by and on, the equivalent of an American twelve-year-old today.[1]

66.      What the 1962 report found, although its authors did not know it, was that the AR-15 was well-suited for use by adolescents on adolescents.

67.      Unlike the larger, heavier, higher-caliber combat rifles that preceded it, the AR-15 was significantly lighter, easier to maneuver, and had less recoil. All of these characteristics make it easy for even adolescent shooters to wield the rifle to extreme lethal effect. The Uvalde Shooter is a prime example. He was not a hulking special forces commando. He was below median height for his eighteen years and had struggled with anorexia.

68.      And just as the 1962 report found that the AR-15 eviscerated, decapitated, and exploded its five-foot, 90-pound victims, the killing wounds inflicted on the fourth graders at

---

[1] According to the Centers for Disease Control and Prevention, the median American twelve-year-old boy is approximately 4'11" and weighs 88 pounds. The median twelve-year-old girl is approximately 5 feet tall and weighs 92 pounds

Copy from re:SearchTX

Uvalde were indescribably barbaric. Dr. Roy Guerrero, a pediatrician and president of Uvalde Memorial Hospital at the time of the shooting, described the carnage he witnessed at the hospital as bodies arrived from Robb Elementary:

> I'll never forget what I saw that day …. What I did find was something no prayer will ever relieve …. Two children whose bodies had been pulverized by bullets fired at them, decapitated, whose flesh had been ripped apart. The only clue about their identities was blood-spattered cartoon clothes still clinging to them, clinging for life and finding none.

69.    Such is the carnage wrought through the AR-15 in our schools.

70.    It is long past the time when anyone – least of all a gun company – can claim surprise after an adolescent like the Uvalde Shooter uses an AR-15 to massacre children and teachers. It is always on a day that begins like any other – with a rushed breakfast, a hassled to-do list, urging your children to put on their shoes and get on the bus so that you can get on with your adult responsibilities – and it always ends like a growing list of days before it – glued to the television, hugging your children harder and longer than you normally do, silently saying thanks that this time it was not at your children's school, not in your community.

71.    And then one day it is at your child's school, in your community. And it is your child who has been destroyed beyond recognition by a troubled, isolated, Call-of-Duty-playing boy wielding an AR-15. To call that experience a nightmare is totally inadequate. Whatever that nameless, indescribable experience is, it is exactly what the Plaintiffs here have suffered.

72.    The Defendants here knew that school shootings have become a feature of American life. They knew – as we all do – that school shootings are almost universally carried out by boys under the age of twenty-one, and usually in their teens.

73.    So if school shootings are almost universally carried out by boys under twenty-one, and the weapon most widely used is an AR-15, and the same profile of mass shooters repeats over

Copy from re:SearchTX

and over – adolescent male, isolation, Call of Duty, struggles with masculinity – then obviously the last thing an AR-15 company should do is court such adolescents behind the backs of their parents and establish a predatory relationship for purposes of selling them a violent fantasy and the tool for carrying it out: an AR-15. Because that conduct will cause another school shooting.

74.     That is exactly what Defendants did here.

## VI.     DANIEL DEFENSE

**A.     The Fundamental Problem at the Heart of Daniel Defense's Business**

75.     In the American firearms industry, many iconic brands trace their origins to the 19th century: Remington, Colt, Smith & Wesson, Winchester. These brands made their mark selling hunting rifles and shotguns.

76.     Daniel Defense is a different type of gun company. Daniel Defense sold its first firearm in 2009. It was an AR-15. Daniel Defense got its start selling AR-15s at a time when the AR-15 market was in the midst of an unprecedented surge. This was also the moment at which American school shootings began an unprecedented surge.

77.     Daniel Defense would not exist if the AR-15 had never become a sought-after consumer product. Today, Daniel Defense is an AR-15 company that happens also to sell a single model of handgun and a bolt-action rifle variant. Its website lists twenty-seven models of AR-15-style rifles for sale.

78.     The first AR-15 Daniel Defense produced was the DDM4. Today, the DDM4 is Daniel Defense's flagship AR-15 model. It is sold in several variants, including the DDM4v7, the rifle used in the Uvalde Shooting.

79.     There is a fundamental problem at the heart of Daniel Defense's business. It is all-in on AR-15s. Its fortune rises and falls with the rise and fall in demand for AR-15s. There are

19

Copy from re:SearchTX

hundreds of other competitors that manufacture the same product, and the number has grown dramatically since Daniel Defense entered the market. In the year 2000, only 29 companies manufactured AR-15s. By 2015, that number had risen 1,700 percent, to approximately 500.

80.     Making matters more challenging, Daniel Defense sells its AR-15s at a substantial markup compared to other manufacturers. The DDM4v7 in particular is not a cheap AR-15. While some AR-15s retail for less than $500, the DDM4v7 costs over $2,000 with tax.

81.     Yet in public court filings, Daniel Defense has admitted that its AR-15 products are functionally – if not aesthetically – "identical" to those sold by other manufacturers. (See Daniel Defense brief, ECF No. 28-1 at 23, in trademark case).

82.     Despite this, Daniel Defense has reaped tremendous corporate profits selling AR-15s to civilians. Between 2006 and 2015, Daniel Defense received more than $200 million in revenue. And in the ten years leading up to the Robb Elementary Shooting, Daniel Defense made over $500 million in revenue selling AR-15s.

**B.     Daniel Defense's Solution: Courting Adolescents**

83.     How does Daniel Defense convince civilian customers to buy combat rifles that they don't need and that cost four times as much as competitors' functionally identical rifles?

84.     The answer is marketing. Daniel Defense spends heavily on marketing the DDM4v7 and its other AR-15-style rifles. It spends between six and eight percent of its revenue on marketing its products. Between 2010 and 2015, Daniel Defense spent more than $13.5 million on advertising.

85.     Daniel Defense does not just market its AR-15s monolithically. Like a savvy marketer, it engages in market segmentation, the practice of identifying targeted groups of customers and tailoring different marketing messages to those groups.

20

Copy from re:SearchTX

86.     On the one hand, Daniel Defense markets itself as a top-of-the-line manufacturer of "the world's finest AR15-style rifles". This marketing is targeted at older, likely middle-aged adults with significant disposable income. It appears in places where such adults are likely to look, such as the "Company Values" and "ISO Certification" pages on Daniel Defense's website – essentially boring pages where no adolescent is likely to spend their time. The images on these pages include gleaming factory machinery, smiling workers, father-son bonding, and middle-aged men camping. Daniel Defense's message to this market is basically that its AR-15s are worth paying a significant premium for because of the company's craftsmanship and American values.

87.     But Daniel Defense has identified another highly lucrative market segment: adolescent boys.

88.     Adolescent boys, especially those approaching the age of eighteen, are a uniquely valuable untapped market. By operation of federal (and Texas) law, they have never before purchased a firearm, let alone an AR-15, from a gun company. Each adolescent who turns eighteen is up for grabs for the first firearms manufacturer who can convince him to purchase one of its firearms. And Daniel Defense means to be first. From there, brand loyalty begins to take effect, and that newly-minted eighteen-year-old is more likely to continue to chose that brand's firearms over others.

89.     Daniel Defense has been open about the special significance it places on first-time AR-15 purchasers. Daniel Defense's founder, Marvin Daniel, has described a person's first firearms purchase in quasi-religious terms, as "a life-changing decision." Daniel Defense believes that when it successfully markets an AR-15 to an eighteen-year-old who does not yet own any firearms, it changes something fundamental about that person. That first AR-15 purchase transforms that person's sense of identity "from being a non-gun owner to a gun owner ...."

21

Copy from re:SearchTX

90.     From that point on, that eighteen-year-old gun owner will be increasingly receptive to Daniel Defense's marketing, and increasingly likely to purchase another, and another, Daniel Defense AR-15.

91.     And so, Daniel Defense has identified and segmented the adolescent market as well. It does not deny this. In sworn Congressional testimony, Marvin Daniel admitted that "getting young people interested in firearm ownership" benefits his bottom line by leading to increased sales.

92.     Daniel Defense is also behind the "Double D Foundation," which purports to "protect the Second Amendment by growing the number of Americans involved in shooting sports …." The actual purpose of the foundation is to provide a tax-exempt marketing wing to target children.

93.     On the Double D Foundation's website, a "letter" from Cindy Daniel is explicit that the foundation's purpose is to reach children who have not had any exposure to firearms: "These young Americans have never felt the surge of adrenaline that comes with that first real trigger pull [or] smelled gunpowder . . ."

94.     Indeed, the firearms industry has been frank in its assessment of the importance of the adolescent market.  In 2012, a "comprehensive consumer study" published by the National Shooting Sports Foundation advised that "managers and manufacturers should target programs toward youth 12 years old and younger" because "[t]his is the time that youth are being targeted with competing activities" other than shooting.

95.     Daniel Defense has heeded this advice. But the manner in which it pursues adolescents and offers AR-15s to them is a type of grooming – a calculated, targeted, courting of a relationship with an unwitting adolescent aimed at one thing: converting that non-gun-owner into

Copy from re:SearchTX

a gun-owner

96.     It is a courtship in four steps.

97.     First, Daniel Defense develops the message for this market. Just as Daniel Defense has segmented the older market and devised a message of quality, craftsmanship, and American values that the older market finds appealing, Daniel Defense has developed a message and narrative attractive to adolescent boys, and especially troubled adolescent boys, based in adrenaline, power, sexual prowess, Call of Duty, and pop culture icons.

98.     Second, Daniel Defense uses the tools at its disposal to reach the adolescent with this messaging and to begin to foster the relationship. It is a tenant of marketing that a business seeking to advertise to a specific audience needs to "meet the audience where they are." For adolescent boys, that is on video games, especially Call of Duty, and social media, especially Instagram. Daniel Defense cannot access the adolescent market on its own, it needs these two platforms to reach the adolescent market. It has their willing cooperation.

99.     Third, through its marketing on social media and Call of Duty, Daniel Defense lures the adolescent to its website, where row upon virtual row of AR-15s are on display, and where Daniel Defense has chosen – despite the common practice in the firearms industry – not to have any age verification measures on its website. While the adolescent is on Daniel Defense's website, Daniel Defense solicits the adolescent's contact information and uses analytics and tracking tools to profile the adolescent as a customer.

100.    Fourth, is the consummation. While on Daniel Defense's website, the adolescent expresses interest in a particular AR-15 by visiting the webpage for the rifle and, ideally, adding the AR-15 to his shopping cart. Now Daniel Defense has the adolescent right where it wants him. Daniel Defense uses the contact information it previously solicited from the adolescent to send

Copy from re:SearchTX

him a targeted offer to sell him the specific firearm he expressed interest in. Daniel Defense does this intentionally and knowingly, despite this being a violation of Texas law.

101.     This courtship describes both Daniel Defense's marketing strategy for adolescents and the course of its specific relationship with the Uvalde Shooter. The end goal of this courtship is for the adolescent to accept Daniel Defense's offer-to-sell when he turns eighteen. In Uvalde, this courtship worked exactly as Daniel Defense intended it to. The Shooter was exposed to Daniel Defense's marketing, visited its website repeatedly over the course of months, provided his contact information, added the DDM4v7 to his shopping cart, received a targeted offer to sell from Daniel Defense when he was seventeen, and ultimately accepted that offer within minutes of turning eighteen. From Daniel Defense's perspective, it could not have gone any better.

102.     Most of the time, that is the end of the story. Daniel Defense has converted another gun owner on the threshold between childhood and adulthood, and the profits flow in.

103.     In today's world, school shootings are undeniably foreseeable. School shootings are so foreseeable that states like Texas require school shooting drills to be practiced. It is foreseeable and indeed highly likely that the teens most drawn to the violent fantasy Daniel Defense sells are those who – like the Uvalde Shooter – are most disturbed, most vulnerable, and most likely to make that fantasy into reality. They will take Daniel Defense's advertising as validation and moral encouragement for carrying out a fantasy of revenge, power, and notoriety.

104.     And, most importantly, they will take Daniel Defense's offer to sell them the specific weapon for carrying out that fantasy as the critical key and encouragement to making that fantasy come true.

105.     Daniel Defense's offer is the culmination of an indoctrination, the hook that is now set. When the adolescent accepts the offer, he has bought not just a Daniel Defense AR-15, but a

Copy from re:SearchTX

belief that his AR-15 is a ticket to lawlessness, a right to assert his superiority, his power, and a right even to kill others.

106.    The result was the Robb Elementary Shooting.

**i.    Step One: Developing a Message to Attract Adolescent Boys**

107.    Minors lack a fully developed prefrontal cortex, and therefore lack fully developed executive decision-making abilities. As a matter of brain development, minors, and especially teens, will be particularly prone to engage in risk-seeking behaviors. For that reason, minors, and especially younger adolescents, cannot drink alcohol, buy cigarettes, drive cars, or purchase an AR-15 from a gun seller like Daniel Defense.

108.    A responsible business marketing its product to minors recognizes that this endeavor is fraught with potential harm.

109.    Daniel Defense is the opposite of a responsible business. It has specifically crafted a marketing message to minors intended to appeal to the most adrenaline-seeking, aggression-prone, and troubled adolescents.

*Aggression and Adrenaline*

110.    Daniel Defense promotes its AR-15-style rifles to adolescents as offensive military weapons meant for inflicting maximum carnage on the battlefield. This advertising is especially attractive to troubled teen boys. It evokes the thrill, adrenaline, and life-or-death stakes of combat. It encourages adolescents to imagine that, once they purchase a Daniel Defense rifle, they too can experience the thrill of combat.

111.    In one advertisement on Instagram, 2 Daniel Defense portrays two military "operators" (denoted through the hashtag, "#operators") using Daniel Defense rifles to "hunt" for

---

[2] All Daniel Defense social media advertisements identified or described in this Petition were posted on Instagram, Facebook, and/or Twitter / X.

Copy from re:SearchTX

human targets. Daniel Defense's caption was "Hunters Hunt.⚡."



112.    The viewers commenting on the post clearly understood Daniel Defense's message that the targets being hunted were human, and indeed were civilian targets. One commentor wrote, "Perfect for a BLM protest😂😂," referring to Black Lives Matter protests. Another commentor wrote, "Send em to Portland," referring to the protests occurring in Portland, Oregon at the time. As a feature of Instagram, Daniel Defense could have deleted these comments made on its post. Alternatively, it could have reported them to Instagram or replied to them, stating that its weapons were not intended for offensive use against civilians. Instead, Daniel Defense remained silent and thereby communicated its approval that hunting civilians was an acceptable and intended use of its assault rifles.

113.    This advertisement is far from isolated. Daniel Defense routinely advertises its AR-15-style rifles in the hands of soldiers in combat scenarios. For example, its ads have included special forces operators armed with Daniel Defense rifles, emerging from the sea at night on an offensive combat mission; and soldiers climbing stairs on a freight ship in a "stacked" formation, Daniel Defense assault rifles drawn and trained at the top of the stairs, ready to open fire on anyone

26

Copy from re:SearchTX

who appears.

114.    One Daniel Defense video advertisement published on social media shows a pitched gun battle taking place inside the dark and cinder-blocked-lined halls of an unidentified building, which could easily be a school or other public building.

### *Extoling Criminal, Murderous Use of Its Weapons*

115.    While Daniel Defense repeatedly markets its AR-15s as military weapons, calling on viewers to imagine themselves in the thrill of combat using Daniel Defense rifles, the company often drops the pretense of lawful military use, and simply extols criminal, murderous use of its weapons.

116.    One Instagram advertisement shows a Daniel Defense rifle equipped with an EOTech holographic battle sight – the same sight used by the Uvalde Shooter. Daniel Defense praises this configuration as a "totally murdered out" Daniel Defense rifle.

117.    In an Instagram advertisement for its Delta 5 Pro rifle posted in March, 2022, Daniel Defense shows the view through a rifle scope, aiming down through a cityscape at the passenger side windshield of a parked car. An Instagram user asked in response to this post: "Is this an assassins setup? And can I buy this?" Daniel Defense's official account's response was to suggest that "anyone" could use this "assassin's setup": "More geared toward MIL/LE [("military / law enforcement)] but adaptable to anyone. Yes, our Delta 5 Pro 16" is live on our site right now!"

Copy from re:SearchTX



118.    On its face, the above advertisement shows offensive and criminal use of a Daniel Defense rifle in a heavily populated cityscape. Daniel Defense's response to the Instagram user's questions about whether the ad shows "an assassins setup" confirms that the advertisement shows an offensive and criminal use. Such use of a Daniel Defense rifle, even if it were not fired, would be a violation of Texas Penal Code § 42.01, which states that a person commits the offense of disorderly conduct if he "intentionally or knowingly … displays a firearm or other deadly weapon in a public place in a manner calculated to alarm." That same Penal Code provision makes it criminal to "discharge[] a firearm on or across a public road." Daniel Defense's advertisement affirmatively depicted and encouraged a criminal act under Texas law.

119.    Indeed, it appears that Daniel Defense engaged in disorderly conduct in violation of Texas Penal Code § 42.01 simply in creating this advertisement, which involved its employees aiming a rifle from a rooftop over a busy city street.

120.    Several viewers noted the extremely violent nature of this ad and that it depicted and encouraged criminal activity. One commentor asked, "So y'all really just out here aiming rifles

28

Copy from re:SearchTX

at the street?😵". Another stated, "This is a strange ad lol telling people to snipe people…". A third

person commented simply "danielassination." Another stated, "I know the Uber was late but y'all

don't think this was too far?😂" Another stated, "Ayo imagine driving by and getting glassed like

jfk". Another asked, "What'd the guy in that little car do to you?" Another asked, "How tf ["the

fuck"] did you guys pull off this photoshoot without someone calling the National Guard on your?!

😂😂😂" Another asked, "😂 yooo why tf ["the fuck"] explain to me what's going on rn ["right

now"]". Another stated, "Some poor fella had a gun pointed at his dome and didnt even know it".

Another asked, "So we're pointing guns at civilians off a rooftop for a photo shoot now??? 😂".

Another person asked, "Why the fuck are you pointing a rifle at random cars from a rooftop?"

121.    Daniel Defense did not respond to a single one of those comments. It could have

disclaimed the criminal use of its weapons against civilians. Instead, it chose to remain silent and

let the image – which clearly shows criminal conduct – speak for itself.

122.    Daniel Defense took this advertisement down after the Uvalde Shooting.

123.    Offensive and illegal civilian use of its firearms from rooftops is an advertising

theme for Daniel Defense. On May 17, 2022, just days before the Uvalde Shooting, Daniel Defense

commented on another user's Instagram post depicting a Daniel Defense bolt-action rifle aimed

down over a cityscape at dusk. The user tagged Daniel Defense in the post. In response, Daniel

Defense liked the post and commented, "Viiibes 🔥". And in a 2018 video advertisement, Daniel

Defense shows two men in apparently civilian clothing working together to aim a rifle from a

rooftop over a cityscape.

124.    In another advertisement, Daniel Defense touts its AR-15s as the "perfect

companion for any close encounters 👽". While "close encounters" can refer to encounters with

aliens, the double meaning of the phrase also includes close-quarters combat, such as inside a

29

Copy from re:SearchTX

school or other building. The advertisement depicts a small-statured, narrow-shouldered individual with long black hair facing away from the camera with a Daniel Defense AR-15-style rifle at the figure's side. From the figure's diminutive size and hidden facial features, the figure appears to be a teenager under eighteen.

125.     In another advertisement, Daniel Defense shows a man dressed in blue jeans and a jacket – apparently a civilian – holding a Daniel Defense AR-15. The caption reads, "Blessed be the LORD, my rock, who trains my hands for war, and my fingers for battle." The message is that it is righteous for a civilian to use a Daniel Defense AR-15 in offensive combat.

126.     Daniel Defense is fond of advertisements that suggest that its weapons are divinely approved, and that their use is righteous. On May 16, 2022, the day the Shooter purchased his Daniel Defense DDM4v7, Daniel Defense posted a social media advertisement showing a toddler holding a Daniel Defense AR-15 and a quote from Proverbs 22:6, "[t]rain up a child in the way he should go, and when he is old, he will not depart from it. 🙏"

30

Copy from re:SearchTX



127.    Daniel Defense removed this advertisement after the Uvalde Shooting.

<u>*Power and Dominance*</u>

128.    Daniel Defense's message to adolescents emphasizes power and dominance, telling adolescent boys that purchasing and using a Daniel Defense AR-15 will make them powerful too.

129.    This advertising is highly attractive to boys who have been bullied. It preys on these boys' feelings of powerlessness and fantasies of revenge, and suggests that by purchasing and using a Daniel Defense rifle, they can flip the power dynamic and get their payback.

31

Copy from re:SearchTX

130.     For example, Daniel Defense advertised its DDM4v7 as "at home in the storm" and "a force to be reckoned with," suggesting to susceptible teen boys that purchasing and using a DDM4v7 will make them, too, a "force to be reckoned with."

131.     In another advertisement, Daniel Defense told viewers that "'Bad' things come in small packages," a message that a small, bullied, teenage boy would be primed to hear as proposing a Daniel Defense rifle as the way to hit back at their bullies and feel badass.

132.     In another advertisement, Daniel Defense told viewers to "Refuse to be a victim 🤙", a message particularly enticing to vulnerable teens who have been bullied and are fed up.

### *Sex and Masculinity*

133.     Daniel Defense's advertising also exploits tropes of sex and masculinity. Adolescent boys – who are going through puberty, developing a sense of self, and wrestling with the insecurities of this period of life – are highly susceptible to this sort of advertising, which tells them that using Daniel Defense rifles makes them manly, powerful, and attractive to beautiful women.

134.     Daniel Defense abides by the mantra that sex sells. It routinely includes the hashtag "#gunporn" in its social media posts, suggesting that its firearms are sexual objects, and endow their owners with sexual prowess.

135.     Daniel Defense portrays its assault rifles as items to be "lusted over." One advertisement crooned, "Oh V7s won't you be my valentine?! Which rifle are y'all lusting over?" "V7s" referred to the DDM4v7.

136.     More explicitly, Daniel Defense works with female social media influencers to portray Daniel Defense AR-15s (and by extension their owners) as sex icons that women cannot resist.

Copy from re:SearchTX

137.   Sometimes, Daniel Defense posted the influencer's content on its own social media page, as it did with the post below from the Instagram influencer and model Jamie_villamor, who has 1.8 million followers, and who's Instagram page is filled with pictures of her in lingerie and swimwear:



138.   On information and belief, on other occasions Daniel Defense has collaborated with an influencer who posts the content celebrating Daniel Defense on her own Instagram account, a commonly used tactic by influencers to make the content appear "organic" and non-sponsored. Below is one such example, in which the influencer still calls attention to the fact that she's holding

33

Copy from re:SearchTX

a Daniel Defense rifle through the hashtag "#danieldefense":



139.    In another influencer post, a beautiful woman holds a Daniel Defense AR-15 equipped with an EOTech holographic sight – the same brand of sight used by the Uvalde Shooter. She looks longingly at the rifle. The caption is "Find someone who looks at you how I look at my quad baby" – a reference to the quad rail handguard on this Daniel Defense AR-15.

140.    Another influencer post shows a blond woman in short-shorts holding a Daniel Defense AR-15. The caption is simply "Daniel Defense 💦".

Copy from re:SearchTX

*Pop Culture*

141.    Daniel Defense also uses pop culture references popular with adolescents to market

its products to them. One advertisement showed the famous musician Post Malone, and attributed

to him the statement, "MK18 got me feeling like a rock star🎶🔥", a reference to Post Malone's

song "Rockstar," which reached number one on the U.S. Billboard Hot 100 and broke the single

week streaming record on Apple Music with over 25 million streams. The song celebrates drive-

by shootings in its lyrics ("Fuckin' with me, call up on a Uzi and show up, man, them the shottas.

When my homies pull up on your block they make that thing go grah-ta-ta-ta ta") and graphic

violence in its music video.



142.    In another advertisement, Daniel Defense referenced the popular and extremely

Copy from re:SearchTX

violent Netflix show, Squid Game, in which civilians compete in a series of children's games, and after which the losing team is executed. Daniel Defense showed someone dressed up as an executioner from Squid Game and armed with a Daniel Defense AR-15 and high-capacity magazines. This ad implies that the executioners in Squid Game would have been more effective at killing civilians if they had used a Daniel Defense rifle.

143.    Daniel defense removed this post after the Uvalde Shooting.

144.    Other Daniel Defense ads have depicted or referenced movies such as Star Wars, Scarface, and Gladiator. One Daniel Defense ad made explicit the connection that the company is trying to draw between video games and its weapons:



145.    Daniel Defense knows that its aggressive, militaristic, and sexualized advertising –

Copy from re:SearchTX

of which the above are mere examples – is highly attractive to young men under the age of eighteen, especially troubled and vulnerable young men who will see this advertising as validating their anger, acknowledging their insecurities, and offering a way out by committing unspeakable violence with a Daniel Defense AR-15.

146.    Since the 2012 Newtown School Shooting, the firearms industry, and indeed the world, has known that aggressive and militaristic firearms marketing is highly attractive to troubled teens and young men. The Newtown Shooter used a Bushmaster AR-15. Bushmaster had for years prior to the shooting advertised its AR-15s by glorifying combat and violence. Following the shooting, families of slain children and educators successfully held Bushmaster and its corporate affiliates responsible for that unconscionable marketing. Their lawsuit brought to light how such advertising is especially attractive and encouraging to the type of troubled teen most at risk of carrying out a mass shooting.

147.    But rather than step back from aggressive and militaristic marketing in light of that knowledge, Daniel Defense went all in. Daniel Defense could not have designed a more appealing marketing message to the Uvalde Shooter. He was the ideal target for Daniel Defense. He was socially isolated; violent; a chronic video-game player, including Call of Duty; he was desperate for attention from girls but was awkward, cruel, and creepy; he was a failure without any economic or romantic prospects, who was furious and determined to prove his superiority and get his revenge.

ii.    **Step Two: Reaching Adolescents Through Instagram and Call of Duty**

148.    It is not enough for Daniel Defense to have a message that is attractive to adolescent boys. It must reach them where they are to deliver that message and begin to groom its targets.

149.    Daniel Defense relies on a two-pronged approach to reach adolescents: Instagram and Call of Duty. In fact, Daniel Defense could not court adolescents with anything approaching

37

the same level of success if it did not have access to these platforms.

150.    Instagram was introduced soon after Daniel Defense began selling AR-15s. Daniel Defense quickly realized that social media, and particularly Instagram, offered an unprecedented opportunity to court adolescents with its marketing message. Not only is the user base of Instagram massive – 2 billion users – it gives Daniel Defense a way to speak directly to adolescent boys, behind their parents' backs.

151.    Today, Instagram has infiltrated nearly every American home. As this was happening, parents had no idea that Instagram was providing Daniel Defense a back door to whisper directly into their children's ears. But Daniel Defense realized that early on, and it has made Instagram advertising a cornerstone of its marketing to adolescents.

152.    Instagram is a particularly effective medium for Daniel Defense to court adolescents for an additional reason. The platform is designed for one purpose, to maximize users' engagement with Instagram.

153.    Instagram is built for the benefit of advertisers, not for users, because Instagram makes its money through selling advertisements. Its goal is to maximize users' engagement with the platform, in order to provide advertisers with a more valuable audience. The more that Instagram can get its users to open the Instagram app and interact with it, the more money it makes. As the Head of Instagram testified before the Senate Committee on Commerce, Science, and Transportation, "we make more money when people spend more time on our platform because we are an advertising business."

154.    Instagram achieves its goal of maximizing user engagement by exploiting fundamental brain chemistry involving dopamine.

155.    Dopamine is a neurotransmitter that is central to the brain's reward system. The

Copy from re:SearchTX

human brain is wired to seek out stimuli that result in dopamine release. But dopamine does not just make something feel good, it makes us want more of the stimulus that made us feel good. Accordingly, the brain's wiring for dopamine can be exploited to cause us to engage in compulsive and repetitive behaviors.

156.   Instagram exploits this brain chemistry by developing the platform to give dopamine hits at randomly spaced intervals, for example when someone likes one of your posts, or when you log on and see new content that you're excited about. A user never knows what they'll find when they open the Instagram app, so each time offers the possibility of a new dopamine reward. In fact, this uncertainty itself makes the experience more addictive – similar to the way in which people can become addicted to pulling the lever on slot machine.

157.   The upshot is that Instagram is incredibly successful at getting users to check the app repeatedly – even compulsively – throughout the day. And adolescents and children are especially vulnerable to these dopamine-driven urgers because they lack the fully developed executive decision-making, and impulse control, of adults. The result is a perfect medium for Daniel Defense to court adolescents.

158.   The second prong of Daniel Defense's courtship of adolescents is Call of Duty, among the most popular video game franchises in history. The firearms industry has long seen video games as an especially effective way to market AR-15s and other firearms to children and teens. As video game graphics improved in the late 1990s and early 2000s, first-person-shooter games proliferated, as did the depiction in them of realistic-looking firearms.

159.   The firearms industry saw a tremendous opportunity to market real-world firearms to gamers, especially young gamers. Firearms manufacturers entered into licensing agreements with video game developers to include branded replicas of their firearms in video games. By the

Copy from re:SearchTX

time of the Newtown School Shooting in 2012, licensed weapons were commonplace in video games.

160.    As one firearms manufacturer explained in a 2012 news article, "Video games expose our brand to a young audience who are considered possible future owners."

161.    The firearms manufacturer Remington reached an agreement with Activision, the maker of the Call of Duty franchise of first-person-shooter games, to feature one of its assault rifles in Call of Duty: Modern Warfare 2, which was released in 2009. According to internal documents, Remington's goal was to "help create brand preference among the next generation" and help the company "win our fair-share of these young consumers" in the long run.

162.    In 2012, a troubled young man obsessed with Call of Duty used a Remington Bushmaster AR-15-style rifle to murder twenty children and six educators at Sandy Hook Elementary School in Newtown, Connecticut.

163.    Following the Newtown School Shooting, the practice of inserting branded and essentially identical copies of real-world firearms into video games largely came to a stop. The practice was seen as irresponsible, dangerous, and controversial.

164.    But irresponsible, dangerous, and controversial is exactly Daniel Defense's marketing style. Daniel Defense found a willing partner in Activision.

165.    Daniel Defense's DDM4v7 was featured in the loading screen for Call of Duty: Modern Warfare, released in 2019. The loading screen is the first screen that a player sees every time they launch the game. In the Modern Warfare loading screen, a shadowy soldier – an "operator" in Call of Duty parlance – brandishes a version of Daniel Defense' DDM4v7 equipped with a holographic combat sight:

40

Copy from re:SearchTX



*The loading screen for Call of Duty: Modern Warfare,*
*prominently featuring a version of the DDM4v7*

166.    Upon information and belief, Daniel Defense entered into an agreement with Activision that Daniel Defense's DDM4v7 would appear on the loading screen for Modern Warfare. In terms of marketing the DDM4v7 to children and teens, this was a tremendous marketing coup for Daniel Defense.

167.    According to the Pew Research Center, Nine-in-teen American teen boys have access to a video game console. Since 2009, a version of Call of Duty has been the best-selling video game nearly every year.  Approximately 100 million people play Call of Duty in a given month. Upon information and belief, tens of millions of those players are below the age of eighteen.

168.    Daniel Defense recognized that Call of Duty presented an unparalleled marketing opportunity to target teens and young men who are interested in firearms and drawn to Call of Duty's hallmarks: epic gun battles, the hyper-realistic simulations of combat, and carnage.

169.    Daniel Defense seized that opportunity with the release of Call of Duty: Modern

41

Copy from re:SearchTX

Warfare, which was released on October 25, 2019. That same day, Daniel Defense posted an ad on Instagram and other social media platforms, tagging the official "@callofduty" Instagram account and declaring, "Modern Warfare launched today! Anyone else had a chance to play it yet? The title screen pictured here features a Daniel Defense DDM4V7s. 💥"



170.    One commentor wrote, "Definitely getting a Daniels now. always wanted one but this sells it 😂" Another wrote, "Noticed that! Pretty cool to see. You can't miss that stock!"

171.    Daniel Defense took this post down after the Uvalde Shooting.

172.    This was a marketing victory for Daniel Defense. After Modern Warfare launched, the first thing that tens of millions of players saw every time they launched the game was a version of the Daniel Defense DDM4v7.

173.    Since the October 2019 release of Modern Warfare, Daniel Defense has routinely

Copy from re:SearchTX

referenced Call of Duty in its internet advertising and attempted to draw an association between the famous first-person-shooter franchise and its assault rifles. It does so in order to market to adolescents.

174.    These advertisements invoking Call of Duty showed soldiers armed with Daniel Defense AR-15-style rifles and dressed to appear like armored and camouflage-clad soldiers from Call of Duty. The ads included Call of Duty hashtags, such as "#callofduty," "#cod," (an abbreviation for Call of Duty regularly used by gamers), "#warzone" (a game in the Call of Duty franchise), "#callofdutywarzone," "#codwarzone," "#callofdutymodernwarfare," and "#videogames." They referenced Call of Duty game features and game modes, with phrases like "Final circle in solos, what's your move?", "How many wins do you and your squad have in Warzone?", "When you're the number one team in plunder, what's your move?!", "Where we dropping boys? ✈️", "Eliminate all enemies or capture the overtime flag to win!".

175.    Daniel Defense used these ads as a form of crowd-sourced advertising. It frequently called on views to "tag" the people with whom they play Call of Duty, which would bring the ads to the social media feeds of the gaming partners who were tagged. For example, Daniel Defense urged views: "Tag your Gunfight partner below!🎮", "Who is your warzone partner? Tag em below!", and "Tag your Duos buddy below."

176.    Viewers responded very enthusiastically to these ads. One Instagram user responded, "@danieldefense you speak COD?? Coolest gun company 😎". Another user commented, "That is so badass i want another DD now #callofdutywarzone #danieldefense". Another said, "So now I have to do a DD build like these for COD. Thanks, guys..." In Call of Duty, a "build" refers to the player's ability to customize the components and appearance of his weapon. The commentor is saying that he will build a Daniel Defense rifle in Call of Duty and

Copy from re:SearchTX

then use it in the game, presumably to kill other players.

### iii.   Step Three: Luring the Adolescent to Daniel Defense's Website

177.   Daniel Defense's advertising attracts the interest of teen boys – and enthralls that vulnerable subset of teen boys who are troubled, socially isolated, obsessed with Call of Duty and other first-person-shooters, and therefore especially susceptible to Daniel Defense's marketing.

178.   But even the most enthralled adolescent cannot purchase a Daniel Defense AR-15 through Instagram or Call of Duty.

179.   Like any predator, Daniel Defense needs to induce the adolescent to take some actions of his own to further the grooming process. Daniel Defense needs the adolescent to visit its website, where it sells its AR-15s directly to consumers, and where the adolescent can be subjected to monitoring, solicitation of contact information, and even further marketing.

180.   That is what Daniel Defense intends its marketing to achieve. On Instagram and through Call of Duty, it puts out its message of adrenaline-soaked violence, of real-life first-person shooting, of power, sex, and masculinity. It does this with the goal of hooking the adolescents attracted to this message, never mind that this message is especially attractive and encouraging to the most troubled, socially isolated adolescents most likely to be led by it to commit a school shooting.

181.   Once the adolescent is hooked and his interest has been grabbed, he naturally makes his way to Daniel Defense's website. Without advertising to hook the adolescent, it is extremely unlikely that he will ever find Daniel Defense's website. Daniel Defense is not some giant in the firearms industry, it is not a household name. It has a market share of less than one percent.

182.   Once the adolescent is on Daniel Defense's website, Daniel Defense has him where it wants him. The adolescent browses the website, with the option of looking at dozens of AR-15-

Copy from re:SearchTX

style rifles.

183.    On every page on Daniel Defense's site, from the homepage to the page for a specific firearm, the teen is prompted to "STAY UP TO DATE" by entering his email address.

184.    The teen is also prompted to "CREATE AN ACCOUNT" and told that doing so "has many benefits: check out faster, keep more than one address, track orders and more."

185.    Daniel Defense intends to induce visitors to its site, including adolescent boys, to enter their email addresses and create user accounts. Indeed, Daniel Defense has at times rewarded those who enter their email address with incentives, such as a 20% off coupon for Daniel Defense merchandise.

186.    Once a teen has entered his email address or created an account (which also requires entering an email address), Daniel Defense has obtained a crucial method to contact the teen directly.

187.    Daniel Defense acts immediately, sending the teen an email full of advertising material and encouraging him to engage further with the marketing published on Daniel Defense's social media pages.

188.    From that point on, Daniel Defense uses the teen's email address in addition to cookies to track the teen's use of its website and the firearms he shows an interest in.

### iv.    Step Four: The Targeted Offer to Sell

189.    Having been hooked by Daniel Defense's marketing and convinced that buying a Daniel Defense AR-15 will make him a powerful, dominant warrior, who can exact revenge on his enemies and experience the thrill of real-life first-person combat, the adolescent takes the obvious next step – and the step that Daniel Defense intends – he adds a Daniel Defense AR-15 to his shopping cart on Daniel Defense's website. He does so for any number of reasons: to see what

Copy from re:SearchTX

the total purchase price will be, including shipping and tax; to fantasize about one day purchasing a Daniel Defense AR-15; or simply for the thrill of being just a few keystrokes away from sending a Daniel Defense AR-15 traveling through the mail to him.

190.    This is when Daniel Defense strikes. Daniel Defense sends an email to the teen, using the email address the teen provided. The email is addressed to the teen directly: "Hi [adolescent's name], are you on the fence?" The body of the email then offers: "Your [specific model of AR-15] is ready in your cart!" The email lists the price of the AR-15 being offered and contains a "RETURN TO CART" button that hyperlinks directly to the teen's shopping cart on Daniel Defense's website, so that the teen can simply click the button and checkout.

191.    This is an offer to sell a specific firearm to that specific adolescent at a specific price – a firearm the teen has already expressed interest in and picked out.

192.    Daniel Defense makes these offers to sell with the intention of inducing the teen receiving the offer to accept it once he turns eighteen, thereby transforming the teen from "being a non-gun owner to a gun owner" and a Daniel Defense customer for life.

193.    At no point in this process does Daniel Defense include an "age gate" or any other age-verification measure that would dissuade underage teens from accessing its website, signing up for an account, browsing firearms, or adding firearms to their cart.

194.    Age gates are common in the firearms industry. For example, Buds Gun Shop, one of the largest online retailers of firearms, includes an age gate:

Copy from re:SearchTX



Palmetto State Armory, a direct competitor to Daniel Defense that manufactures and sells AR-15s,

includes an age gate:



47

Copy from re:SearchTX

195.    Springfield Armory, another direct competitor to Daniel Defense, maintains an age-gate that requires visitors to the site to be twenty-one.

196.    The list of AR-15 manufacturers and firearms retailers that include age gates on their websites goes on: Ruger, Keltec, Heckler & Kock, Barrett, LMT Defense, Bravo Company USA, Aero Precision, Knights Armament, Black Hole Weaponry, Sons of Liberty Gun Works, Faxon Firearms, Geissele Automatics, Black Rain Ordnance, Adams Arms, Alexander Arms, Juggernaut Tactical, GunBroker.com, RK Guns, Atlantic Guns, and on.

197.    Daniel Defense has chosen not to implement an age gate on its website for a simple reason. Unlike, for example, Palmetto State Armory or Buds Gun Shop, whose sites are "intended for individuals of at least 18 years of age," Daniel Defense's website is intended for individuals below 18 years of age.

198.    Age gates are far from perfect, but Daniel Defense's decision not to include an age gate even to this day speaks volumes: adolescents younger than eighteen are among the target audience for its website. Daniel Defense intends to draw underaged teens to its website so that it can send them targeted offers to sell them specific firearms.

199.    In Congressional testimony, Marvin Daniel lamented "an erosion of personal responsibility in our country and in our culture" and vaguely blamed mass shootings on this "erosion."

200.    Marvin Daniel is correct that there is a lack of personal responsibility with respect to mass shootings. But this is not due to some inchoate "erosion" of personal responsibility in "our culture." The personal responsibility that is missing is the incredible refusal of Daniel Defense to take responsibility for the violence caused by its intentional and knowing extension of targeted offers to sell assault rifles to underaged teens – the very assault rifles that Daniel Defense has

Copy from re:SearchTX

groomed them through its marketing to fantasize about using in combat.

201.    Daniel Defense should have known and does know that some portion of the boys it targets with these offers to sell will be influenced and led by the offer to commit unspeakable acts of violence. Daniel Defense does not care. As long as the profits continue to flow in and it continues to avoid accountability for its wrongdoing, Daniel Defense will continue to target adolescents.

## VII.    The Shooter: Daniel Defense's Ideal Target

### A.    The Shooter's Background

202.    The adolescent who used a Daniel Defense DDM4v7 in the Uvalde Shooting was the ideal target for Daniel Defense. He was exactly the type of troubled young person most susceptible to Daniel Defense's marketing and targeted offer to sell. He was socially isolated; violent; a chronic video-game player, including Call of Duty; a failure without any economic or romantic prospects, who was furious and determined to prove his superiority and get his revenge. He was exposed to Daniel Defense marketing and Daniel Defense sent him a targeted offer to sell the DDM4v7 while he was under the age of eighteen. Primed by Daniel Defense's marketing and offer to sell, he fantasized about using a DDM4v7 to carry out a shooting that would give him the surge of power, the notoriety, and the revenge he craved. Within minutes of turning eighteen, he accepted Daniel Defense's targeted offer to sell him a DDM4v7. Eight days later, nineteen children and two teachers were dead. The massacre was the foreseeable outcome of Daniel Defense's months-long effort groom the Shooter before he turned eighteen and sell him a fantasy of destruction.

203.    The Shooter was named Salvador Ramos. He was born May 16, 2004. Soon after his birth, his mother and her boyfriend split up. The Shooter saw little of his father from that point

49

on. The Shooter's mother struggled with drug use, and the Shooter felt that he had been neglected, even abused, by his mother. The Shooter grew up economically disadvantaged. He often wore the same clothing multiple days in a row. The Shooter struggled academically. By the third grade, school officials had identified him as "at-risk" due to repeated poor test results. The Shooter believed he was dyslexic, although he never received special education services.

204.    At some point in the Shooter's early childhood, one of his mother's boyfriends sexually assaulted him. The Shooter told his mother, but she did not believe him.

205.    In elementary school, the Shooter began to experience bullying by his peers. Other children bullied the Shooter over a stutter he had, his clothing, and his short haircut. In one incident, another student tied the Shooter's shoelaces together, causing him to fall and injure his face.

206.    In notes he wrote, the Shooter recounted further bullying in middle school and high school:

> From 6th grade to sophomore year I was bullied. Did you know I skipped a lot of 7th, 8th, 9th, and 10th grade. Because I was bullied. 10[th] grade I probably went to school for like 2 weeks. 9th I missed over 3 months of school. 8th I missed so much school and 7th I barely. So I haven't even been to school that much at all. I used to cry almost every day when I went home how much my life sucked. I USED TO WALK HOME AND CRY IN 8th grade cuz I was getting bullied. There's so much times I walked home crying…. And there's more stuff but I don't want to get into that it's bad.

He recounted the bullying in more detail in another note:

> I have been bullied/ harassed my whole school career. Slapped, slapped with germ x, tripped, punched, pick[ed] on, pushed down the stairs, was getting bullied because i started beating my dick in 7th grade, cried in front of the whole class, yelled at by multiple people, slapped so hard I had a bruise on my cheek for a couple days. I had to walk outta school so much times I would cry all the way home because people were so mean to me. I was getting bullied at a lunch table And I was crying so much that I had to switch to a younger table. I was told constantly i was ugly [as fuck,] even girls would bully me and i was scared to say anything to anyone. I ask[ed]

Copy from re:SearchTX

> the counselor to switch my classes and she was asking why and I didn't tell her because i was terrified of what would happen to me. And THAT WAS SOPHOMORE YEAR. I was so depressed in 2020 crying my self to sleep almost every day because I was felt so lonely. I wanted to get a job but that would mean I couldn't see Stephen and he is my only friend so I that meant i would be even more sadder.

The bullying left him furious and vengeful:

> But damn you called me a qui[e]t kid and wonder why I'm so anti social well I told you I hate people. And I will never change. And I wishes sum 1 tried to bully me I would beat the living shit outta them and rape them till they fucking bleed 🤬.

207. The Shooter's rage revealed itself especially when he played video games. People he played video games with onilne reported that he became enraged when he lost. He made extremely violent threats, especially towards female players, whom he would terrorize with graphic descriptions of violence and rape.

208. The Shooter's fixation on violence and revenge also revealed itself in his choice of screen names for social media accounts, gaming accounts, and email addresses, such as: rev6nge@gmail.com, rev3ngevan@gmail.com, ima_k1ll_you_6, rev6enge, Sal Revcnge, salv8dorfights, disrupts, and TheBiggestOpp.3

209. In other notes, the Shooter described neglect and eating disorders. He described his mother's drug addiction and his feeling that he was not cared for as a child: "I used literally sleep with a towel instead of a blanket …. My dad was never here he was either in jail or out of town." He described how he had struggled with, and continued to struggle with, eating disorders: "I was sickly skinny because I would never eat because my Ed [("eating disorder")] was so bad. I had to go to the hospital because I would barely eat. I was anorexic back in late 2020. I was sticking a

[3] "Opp" is slang, commonly used on social media" for an opponent or enemy.



Copy from re:SearchTX

finger in my mouth and throwing up all my food back in January."

210.    In 2018, the Shooter's school attendance began to decline precipitously, and he began to record more than one hundred absences annually. He received failing grades and dismal performances on standardized tests.

211.    By the beginning of the 2021 school year, when the Shooter was seventeen, he had only completed the ninth grade. On October 28, 2021, Uvalde High School involuntarily withdrew him due to his failing academic performance and lack of attendance.

**B.    The Shooter's Deepening Isolation and Anger**

212.    As the Shooter's school attendance fell off a cliff, leading to his eventual involuntary withdrawal, he retreated from the real world into a world of social media and video games. The Shooter engaged in compulsive and problematic Instagram usage. The Shooter routinely had well over a hundred interactions with the Instagram app per day, and used Instagram into the early hours of the morning, often as late as 2:00, 3:00, or even 4:00 in the morning. The Shooter had at least twenty Instagram accounts. The Shooter's former girlfriend stated that the Shooter would either "stay up all night or sometimes he would sleep barely."

213.    According to the Shooter's former girlfriend, by this time the Shooter "didn't have any friends" and in terms of close family relationships, "he had no one." The Shooter's isolation deepened even further when his girlfriend – the only one he'd ever had – broke up with him in mid-2021. She described the Shooter as "creepy and obsessive" and "out of the ordinary bad." "[H]e threatened me so many times."

214.    By mid-2021, the Shooter was failing out of school; he was compulsively using social media; he was depressed and anorexic. He had withdrawn and isolated himself from in-person contact. His peer group was nearing the end of high school. They would soon be embarking

Copy from re:SearchTX

on lives of their own, while his own prospects for a successful, happy future were increasingly bleak.

215.    At this time, the Shooter began to express an inchoate, vague fantasy of becoming famous and proving his superiority. On July 3, 2021, the Shooter messaged one of his acquaintances: "WE GONNA BE FAMOUS ASF ["as fuck"] 📈 📈", including the "chart increasing" emoji symbolizing growing wealth.

216.    On August 18, 2021, the Shooter created a note on his iPhone that said "I'm a unknown genius and I will impact society in a good way by September 2022." On August 19, 2021, the Shooter texted a peer that he was a "genius" and would "be everywhere by September 2022 🧍." He had TikTok and YouTube channels where he posted videos that received a paltry number of views. Even then, he told others he was "famous" and they were mere "randoms" by comparison.

217.    Of course, the Shooter had no skills or remotely practical plan to become rich. He was not a YouTube celebrity. He was not an "unknown genius." These were fantasies of superiority he told himself and others to counteract the cold truth: he was a "random" headed for failure and obscurity.

## C.    The Shooter and Call of Duty

218.    While the Shooter dwelled on his insecurities and nursed a fantasy of proving his superiority, he spent his time on Instagram, other social media platforms, and playing Call of Duty. Call of Duty: Mobile was released on or around October 1, 2019. By October 3, the Shooter had downloaded Call of Duty: Mobile onto his iPhone and was playing it.

219.    Call of Duty: Mobile is rated "17+" on the Apple App Store because of, among other attributes, its "Frequent/Intense Realistic Violence." The Shooter was able to download and play Call of Duty: Mobile despite being only fifteen at the time.

53

Copy from re:SearchTX

220.     The Shooter also played Call of Duty games on his PlayStation console, including Call of Duty: Black Ops Cold War; Call of Duty: Warzone; and Call of Duty: Black Ops III. All of these Call of Duty games are rated "M" for "Mature," meaning that game retailers are not supposed to sell these games to children under the age of seventeen.

221.     In October 2020, the Shooter sent a message to a Discord user that contained the link to a YouTube video that, upon information and belief, shows the Shooter playing Black Ops III with another player online. In the video, the Shooter shows great skill. He fires accurately, reloads and fires from cover, scores "headshots," and repeatedly kills the other player. He is clearly an experienced Call of Duty player. Upon information and belief, the Shooter spent hours upon hours playing this and other Call of Duty games.

222.     On November 5, 2021, the Shooter purchased Call of Duty: Modern Warfare by direct download onto his PlayStation. The Shooter was so excited to play that he took a picture of the download screen with his phone.

**D.    The Shooter Is Exposed to Daniel Defense's Marketing Exactly as Daniel Defense Intended**

223.     In the summer of 2021, the Shooter was determined to do something big, something that would prove his superiority, allow him to act out his anger, and fulfill his fantasy of revenge. But he did not know what that something would be.

224.     By the end of 2021, the Shooter had begun to formulate the idea of committing a mass shooting with a Daniel Defense DDM4v7. This was not happenstance. This idea did not just pop into the Shooter's head fully formed. It developed over the course of months, as the Shooter was exposed to Daniel Defense's marketing.

225.     In that intervening period, the Shooter downloaded and played Call of Duty: Modern Warfare – the Call of Duty game that featured a version of the DDM4v7 equipped with a

54

holographic combat sight.

226.    In November 2021, within weeks of downloading Call of Duty: Modern Warfare, the Shooter began to research the tools he felt he needed for a mass shooting. He began to research firearms online.

227.    Upon information and belief, beginning at that time and carrying forward to the day of the shooting, the Shooter was exposed to Daniel Defense marketing.

228.    The cache in the Shooter's phone contains numerous Daniel Defense marketing images for the DDM4v7 and other Daniel Defense firearms. Cached data is overwritten by an iPhone over time as more space is needed, meaning that these cached images very likely represent just a fraction of the Daniel Defense advertising that was displayed on the Shooter's phone.

229.    The Shooter was living with his mother (and later his grandmother) and had essentially no expenses. He took a job at a local Whataburger and began saving money. He told acquaintances that he was "saving for something big."

230.    The Shooter was exactly the type of troubled boy who would be most attracted to Daniel Defense's aggressive, combat-fetishizing, and sexualized marketing. He saw himself as a loner and a victim; he believed he had been neglected and mercilessly bullied and he thirsted for revenge against the world; he was a dropout without any economic prospects or meaningful skills, yet he dreamed of proving his superiority; he played violent video games, especially Call of Duty; he fantasized about women but was awkward, unable to keep a girlfriend, and had become increasingly chauvinistic in his interactions with girls online, clumsily attempting to solicit nude pictures and hookups and continuously being rebuffed; he had begun to display an interest in violent, gory videos, including videos and images of violent sex, suicides, and beheadings.

231.    He was, in other words, an easy mark for Daniel Defense's grooming strategy.

Copy from re:SearchTX

232.    This strategy progressed exactly as Daniel Defense intended. On December 29, 2021, the Shooter visited Daniel Defense's website and browsed Daniel Defense's AR-15s. Upon information and belief, he did so after being exposed to Daniel Defense advertising on Instagram and other internet platforms.

233.    From December 29, 2021 until he carried out the shooting – a period of nearly five months – the Shooter repeatedly visited Daniel Defense's website and was exposed to Daniel Defense's internet advertising. He repeatedly viewed the DDM4v7 online. The Shooter visited Daniel Defense's website so frequently, that the Safari browser on his iPhone automatically created a bookmark for Daniel Defense's website as a "frequently visited site."

234.    In researching the DDM4v7, the Shooter saw himself as equipping for battle in the same way that he had time and time again when playing Call of Duty. In a January 2022 online conversation with an acquaintance, the Shooter and the acquaintance discussed types of AR-15 rounds. The acquaintance claimed that he had "green tips," a common phrase used to refer to armor piercing rounds. The Shooter explained that "[t]hose suck" because "[t]hey're made to go through armored stuff … but they're not good for hitting ppl it goes straight through them [m]ost of the time." That was the type of knowledge the Shooter gained from playing Call of Duty.

235.    The Shooter googled for "weapon skin ar15" and visited gunskins.com, a website that sells vinyl "gun wraps" for AR-15s that allow users to "customize" their AR-15s.

236.    Gun skins are a feature of Call of Duty: Modern Warfare that players can use to change the appearance of their firearms by adding patterns (e.g., camouflage, skulls, tiger stripes) or colors. Players earn gun skins by completing various challenges, such as killing 25, 50, or even 800 enemies with "assault rifles"; killing enemies with "headshots"; getting "double kills"; killing enemies with firearms equipped with attachments, like sights; or getting kills "shortly after

56

Copy from re:SearchTX

reloading."

237.    The Shooter continued to play Call of Duty – and therefore continued to be immersed in Daniel Defense's marketing message – while he was simultaneously fantasizing over the DDM4v7 and being exposed to Daniel Defense's marketing on the internet.

238.    The shooter's interest in the DDM4v7 made him increasingly motivated to earn extra money so that he could afford the DDM4v7. The Shooter began tracking his work hours and earnings. In March 2022, he created a note that said:

> Money to get by April
> 1000 from Wendy's
> 264
> 450 from child support
> 😐😀💀💀💀💀💀💀💀💀💀💀💀💀

## E.    The Shooter Acquires the Accessories for a School Shooting

239.    As the Shooter was steeped in Daniel Defense's marketing message of adrenaline, violence, revenge, and sex, he researched and acquired the accessories for carrying out a school shooting. For the Shooter, this was about both having the practical tools and looking the part of a deadly operator, as shown in Daniel Defense's marketing and Call of Duty.

### i.    The Shooter Acquires a Hell-Fire Gen 2 Snap-On Trigger System, So He can "Unleash Fell Fire"

240.    In April 2022, the Shooter legally purchased sixty thirty-round AR-15-compatable high-capacity magazines from cheaperthandirt.com. This was enough to hold 1,800 rounds of ammunition – an obscene amount that would weigh approximately 47 pounds. There was no way the Shooter could use that much ammunition in a school shooting using semi-automatic fire.

241.    But he did not plan on using semi-automatic fire alone. As the Shooter was researching the DDM4v7 and being exposed to Daniel Defense marketing, he expressed an interest in gaining the ability to make a semi-automatic AR-15 fire at a rate equivalent to an automatic

Copy from re:SearchTX

military AR-15-style rifle.

242.    In January 2022, the Shooter visited Defendant Firequest's website, firequest.com, and viewed the Hell-Fire Gen 2 snap-on trigger system. And at the beginning of March 2022, the Shooter purchased a Hell-Fire Gen 2 snap-on trigger from Firequest.

243.    The Hell-Fire Gen 2 snap-on trigger system is not a trigger. Nor is it much of a "system." It is a piece of metal that snaps onto an AR-15's grip and sits behind the trigger. When the user pulls on the trigger and continues to exert pressure on the trigger, the snap-on Hell-Fire device uses the firing cycle to cause the AR-15 to continuously fire rounds until the magazine is empty or the user releases pressure on the trigger. In this manner, the Hell-Fire Gen 2 snap-on trigger system allows an AR-15 owner to convert their semi-automatic rifle to fire at a rate indistinguishable from a fully automatic rate of speed, simply by snapping on the trigger system.

244.    A Firequest promotional video for the Hell-Fire Gen 2 shows the user, in just six seconds, snapping the trigger system onto the grip of an AR-15 pistol behind the trigger. The user then demonstrates the fully automatic rate of fire, and then snaps the Hell-Fire Gen 2 off in four seconds. "It just doesn't get any better," he says.

245.    Firequest described the Hell-Fire Gen 2 snap-on as "the epitome of … any rapid-fire system ever …. All you have to do is squeeze the trigger to shoot at rates up to 900 rpm."

246.    Firequest's marketing for the Hell-Fire Gen 2 makes clear that it is a combat weapon, meant to give civilian users access to the "full auto rates of fire" characteristics of military AR-15-type rifles.

Copy from re:SearchTX



This advertising for the Hell-Fire Gen 2 closely mirrors the look of a famous character, "Ghost" from Call of Duty:



59

Copy from re:SearchTX

247.    Firequest's advertising for the Hell-Fire Gen 2 is intended to appeal to individuals attracted to violence and aggression. The marketing urges viewers to unleash "HELL-FIRE" and shows a gunman wearing a chilling skull mask as he uses the Hell-Fire Gen 2 to unleash automatic fire from an AR-15.

248.    The only purpose of wearing such a mask when firing automatic fire from an AR-15 would be to strike terror in human targets during an offensive shooting. There is no practical or remotely reasonable use of such a mask in hunting, target shooting, or home defense.

249.    A previous version of the Hell-Fire trigger system was used in the 101 California Street shooting in July 1993, where a gunman killed eight people and wounded six before killing himself. The Branch Davidians also used Hell-Fire triggers at their militarized Waco, Texas compound.

250.    The selling point of the Hell-Fire trigger system is that it allows an AR-15 owner to achieve a rate of fire essentially equivalent to that of a machinegun.

251.    Not surprisingly, under federal law, the Hell-Fire Gen 2 snap-on trigger system is a machinegun. Federal law defines a machine gun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun*, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

252.    Machine guns are strictly regulated by federal law. Under 18 U.S.C. § 922(b)(4), it is illegal for any licensed importer, licensed manufacturer, or licensed dealer to sell or deliver a

60

Copy from re:SearchTX

machine gun to any individual, corporation or company unless specifically authorized to do so by the Attorney General.

253.    Similarly, Texas Penal Code § 46.05(a) makes it a criminal offense to possess, manufacture, transport, repair, or sell a machinegun.

254.    From the time that it began manufacturing, marketing, or selling the Hell-Fire Gen 2 snap-on trigger system, and continuously thereafter, Firequest knew that the Hell-Fire Gen 2 snap-on trigger system allows the user to unleash automatic fire through a single pull of the trigger, and therefore is a machinegun under federal and Texas law.

255.    In March 2022, the ATF published an open letter to all federal firearms licensees stating that forced-reset triggers – which operate similarly to (and with the same effect as) Hell-Fire trigger systems – are machineguns under the National Firearms Act and the Gun Control Act because they allow users "to automatically expel more than one shot with a single, continuous pull of the trigger."

256.    In September 2023, the ATF sent a cease-and-desist letter to Firequest, stating that the Hell-Fire Gen 2 was a machinegun under the National Firearms Act and the Gun Control Act. The ATF ordered Firequest to "[c]ease and desist your manufacture, sale, or transfer of 'Hellfire Gen 2' and 'Hellfire Gen 2 AR' trigger devices," and to "[s]urrender" any Hellfire Gen 2 triggers in Firequest's possession.

257.    The Shooter was drawn to the Hell-Fire Gen 2 snap-on trigger system precisely because Firequest promoted it as a machinegun. The Shooter was exposed to Firequest's marketing for the Hell-Fire Gen 2 snap-on trigger system on the internet. And the Shooter purchased a Hell-Fire Gen 2 snap-on trigger system after being exposed to that marketing.

258.    Additionally, Daniel Defense's marketing encourages fully automatic fire and

Copy from re:SearchTX

repeatedly shows individuals firing Daniel Defense AR-15s in full-auto. In these advertisements, Daniel Defense promotes automatic firing of its assault rifles through messages like, "Happy #fullautofriday everyone!!! 👌🏻👊🏾"; "There's nothing better than a Mk18 with a fun switch!"; "Today's #fullautofriday is brought to you by the DDM4V7 .300 BLK"; and "Ringin' in #fullautofriday with a suppressed MK18! 💥". Daniel Defense promotes automatic fire of its weapons to civilians even though it knows that it is illegal for civilians to possess a machinegun.

259.   By purchasing the Hell-Fire Gen 2 snap-on trigger system, the Shooter gained the ability to illegally unleash fire at an automatic rate-of-speed from his DDM4v7, just like the shooters in Daniel Defense's videos.

260.   Purchasing the Hell-Fire Gen 2 snap-on trigger system gave the shooter the deadly advantage of an increased rate of fire, and therefore increased, indiscriminate lethality in the close quarters of a classroom. Purchasing the Hell-Fire Gen 2 snap-on trigger system also gave the Shooter a psychological advantage. His time playing Call of Duty had made him intimately familiar with, and confident in using, automatic AR-15-style rifles. Upon information and belief, armed with these lethal advantages, he felt encouraged and more confident in his ability to carry out a mass shooting.

### ii.   The Shooter Acquires A "Battle Proven" Eotech Holographic Sight So He Can "Neutralize The Threat With Turbocharged Speed"

261.   Shortly thereafter, the Shooter made another purchase inspired by Daniel Defense's marketing, another purchase that equipped him to carry out a close-quarters mass shooting. On April 16, 2022, the Shooter ordered an EOTech holographic sight, model "HWS XPS2 Green," from EOTech's website for just under $800.

262.   Holographic sights are state-of-the art combat sights, used by military operators and special forces. They allow their users to look through a glass viewing window, where a

Copy from re:SearchTX

targeting reticle is projected onto holographic film located within the sight. By using a laser and a series of mirrors, holographic sights project a three-dimensional hologram back to the user. From the user's perspective, the hologram appears superimposed on their field of view. This type of sight allows the user to aim and fire with both eyes open, allowing an unrestricted field of view and peripheral vision.



*Example view through an EOTech holographic sight from an EOTech promotional video*

263.    By ordering the EOTech combat sight, the Shooter was acquiring the type of sight featured on the DDM4v7 in Call of Duty: Modern Warfare's loading screen:

Copy from re:SearchTX



264. Indeed, EOTech's holographic combat sights are useable by players and appear by name in Call of Duty. EOTech's holographic sight and appears by name in Call of Duty: Ghosts and Call of Duty: Black Ops II. And its sight appears in Call of Duty: Modern Warfare without the EOTech brand name visible. Even where the EOTech sight appears unbranded, it is so recognizable to Call of Duty players as an EOTech holographic site, that players often refer to it as "the EOTech Sight."

265. It is no surprise that EOTech's holographic sights appear in multiple Call of Duty games. The EOTech HWS XPS2 is a combat sight, designed for killing people. EOTech's marketing makes that clear. EOTech's tagline for the HWS XPS2 is "NEUTRALIZE THE THREAT WITH TURBOCHARGED SPEED". On its website, EOTech describes the sight as "[a]n operator-grade Holographic Weapon Sight built for close-quarter engagements with fast-moving targets" that "allow[s] the shooter to quickly pick up and lock on a target." In its advertisements and on its website, EOTech describes the outer ring in its sight's reticle as the "donut of death."

64

Copy from re:SearchTX

266.   In its advertisements and on its website, EOTech describes the outer ring in its sight's reticle as the "donut of death." Elsewhere on its website, EOTech lists the "advantages" of the sight "for close-quarter battle (CQB)".

267.   The user manual also makes clear that the HWS XPS2 is intended for combat: "The major combat advantage of the HWS is extremely rapid reticle-on-target acquisition." An EOTech promotional video describes its holographic sights as "battlefield proven", "the choice of America's elite warriors", and "engineered with a singular purpose: to help you acquire and hit the target before the target acquires you."

268.   As the Shooter was planning to kill as many people as possible in the close quarters of an elementary school, EOTech's marketing of its holographic battle sight described exactly what he wanted.

269.   Indeed, EOTech supplies holographic sites to the United States military. In 2019, EOTECH was awarded a $26.3 million contract to supply holographic weapon sights and clip-on magnifiers to the military. EOTech's marketing portrays its holographic weapons sights as ideal for offensive combat missions.

270.   In one Instagram ad, EOTech declared that an assault rifle equipped with an EOTech holographic sight is "Breach-ready 😏." Breaching refers to an offensive combat practice by military operators and SWAT teams in which they burst into rooms to kill or subdue the people inside. Because the Shooter planned to assault a school, where children would be on lockdown, he could expect that he would need to breach. EOTech's advertising portrayed its holographic battle sight as the perfect tool.

65

Copy from re:SearchTX



271.     In another Instagram ad, EOTech showed a video clip of a soldier firing into an apparently civilian SUV using an assault rifle equipped with an EOTech holographic sight and set to fully automatic fire. EOTech's caption was "Just let it loop, over and over again— you know you want to." In another Instagram advertisement, a self-declared former Navy SEAL declared that an EOTech holographic weapons sight was "the last thing Osama Bin Laden saw, and the only thing I'll ever use."

272.     In another Instagram ad, EOTech shows a slow-motion video of a man walking with a rifle while an unseen narrator threatens in a guttural, eerie voice:

> I was born with something inside me that refuses to settle for average, and am grateful for it. I am a warrior, a destroyer, a force of pure violence, and all that I desire is the sheer glory of victory. Mercy is for the weak. Surrender for those who have no conviction.

66

Copy from re:SearchTX

I am coming for this world and all it has to offer. Nothing will stop me.

273.   Despite designing and intending the holographic sight for combat use, EOTech sold the Shooter the HWS XPS2 Green even though he was a civilian and only seventeen years old. Upon information and belief, at no point did EOTech ask the Shooter's age.

274.   EOTech's website does not include any age-verification features. EOTech knew or should have known that its advertising was attractive to teen boys, especially troubled teen boys drawn to violent fantasies of combat, dominance, and revenge.

275.   EOTech uses Instagram, Call of Duty and other video games, and blockbuster movies to market its combat sights – marketing strategies that are highly attractive to teen boys.

276.   In one Instagram ad, EOTech showed game footage from a first-person-shooting game where players can use the EOTech 553 holographic sight. The narrator praised the game for allowing the player to do "some real world training" with the EOTech sight.

277.   In another Instagram ad, EOTech showed a video of one of its sights being used in a video game and asked commentors to "Name the game🎮👇"

278.   In one Instagram ad, EOTech bragged, "Our friends at Independent Studio Services, @issweapons a prop house in California, is [sic] setting up guns for three potential blockbuster movies. Can't wait to see them on the big screen." The ad depicted assault rifles equipped with EOTech battle sights.

279.   In another Instagram post showing a first-person view through a holographic sight, EOTech declared "There is no view, like a POV view..." referencing both visually and in words the player's experience of shooting a firearm in Call of Duty. As one commenter stated, "Bro has them call of duty hacks on 💀🤘".

280.   EOTech and Daniel Defense have a symbiotic marketing relationship, and each

67

Copy from re:SearchTX

often markets its products in conjunction with the other's products, portraying the combination of the two as a superior, deadly weapons system. In April 2022, when the Shooter purchased his EOTech sight and added the DDM4v7 to his shopping cart on Daniel Defense's website, Daniel Defense's homepage prominently advertised the DDM4v7 accessorized with an EOTech sight.

281.    Daniel Defense also heavily marketed its AR-15s equipped with EOTech sights on social media. For example, as described above, Daniel Defense celebrated its rifle equipped with an EOTech combat sight as "totally murdered out". EOTech's social media posts likewise prominently featured Daniel Defense assault rifles. Daniel Defense has even sold its AR-15-style rifles with EOTech holographic sights included.

282.    Upon information and belief, the Shooter was exposed to EOTech marketing online – and Daniel Defense marketing featuring EOTech sights – leading him to purchase an EOTech holographic combat sight. The Shooter's purchase of the EOTech sight gave him both a practical tool and, in EOTech's words, increased "confidence." It is a sight designed and optimized for close-quarters killing, and one that he had experience using in Call of Duty. The Shooter's purchase also gave him the look he desired: a DDM4v7 equipped with a holographic battle sight, just like in the Modern Warfare loading screen.

283.    The Shooter could not wait to receive his EOTech sight. After he purchased it, he googled "how long does eotech take to ship" and he viewed EOTech's "shipping and returns" webpage.

284.    After ordering the EOTech sight, he bragged to one of his acquaintances, sending a picture of the sight and stating, "That came out to 795". The Shooter then messaged his acquaintance, "I'm about to get 2 ars … Wanna see"? He then navigated to Daniel Defense's webpage for the DDM4v7 and took and sent a screenshot. Later, the Shooter messaged someone

68

Copy from re:SearchTX

else, sending them a picture of the EOTech sight and saying, "Ima attach it to the ar".

**F.     Daniel Defense Sets the Hook: It Knowingly And Intentionally Offers To Sell The Ddm4v7 To The Seventeen- Year-Old-Shooter**

285.     By the end of April, 2022, the Shooter was fully within Daniel Defense's predatory grasp. He had for months been browsing Daniel Defense's website and been exposed to its marketing. He had purchased an expensive holographic battle sight that Daniel Defense had repeatedly advertised its assault rifles with. He had purchased the Hell-Fire Gen 2 so that he could achieve automatic rates of fire, as promoted by Daniel Defense and Firequest.

286.     On April 27, 2022, when the Shooter was still seventeen, he took the step Daniel Defense had been waiting for, and on which its predatory courtship of the Shooter had been aiming for months: he signed up for an account on Daniel Defense's website.

287.     After the Shooter created the account, Daniel Defense quickly sent him an email with the subject line, "Welcome, Salvador Ramos!" and informing him that now that he'd made an account, he could "[p]roceed through checkout faster when making a purchase."

288.     On April 27, 2022, after creating his Daniel Defense account, the Shooter added the DDM4v7 to his shopping cart on Daniel Defense's website but did not complete the purchase.

289.     On April 29, 2022, Daniel Defense delivered the strike to consummate the predatory relationship it had been grooming the Shooter for. Daniel Defense sent the Shooter an email with the subject line, "Hi Salvador, are you on the fence?" The body of the email offered, "Your DDM4®v7® is ready in your cart!" The email listed the price of the DDM4v7 and contained a "RETURN TO CART" button that hyperlinked directly to the Shooter's shopping cart on Daniel Defense's website, so that the Shooter could simply click the button and complete his purchase.

290.     This email was an intentional and knowing offer to sell a firearm to a person under

69

the age of eighteen, in violation of Texas Penal Code § 46.06, which states that a corporation commits a criminal offense if it "intentionally or knowingly ... offers to sell, rent, lease, or give to any child younger than 18 years of age any firearm ...."

291.    Daniel Defense intended to make the offer to the Shooter and intended to make it to a child younger than eighteen years of age.

a. As described in detail throughout this Petition, Daniel Defense intentionally and aggressively markets its firearms in a manner calculated to groom adolescent boys, with the conscious objective and desire of drawing them to its website, soliciting their email address, and then sending targeted offers to sell specific firearms to specific adolescents. Daniel Defense intends for the adolescents to accept the offer once they are of legal age.

b. Daniel Defense intentionally makes such offers to sell specific firearms targeted at specific adolescents because these offers are effective at converting non-gun owners into gun owners, exactly as occurred with the Shooter.

c. Marvin Daniel has described a person's first firearms purchase as "a life-changing decision" and "a life decision to change from being a non-gun owner to a gun owner ...."

d. In Marvin Daniel's sworn Congressional testimony, he admitted that "getting young people interested in firearm ownership" benefits his bottom line by leading to increased sales.

e. Daniel Defense knows that a first gun purchase is no trivial decision, and it made the offer to sell to the underaged Shooter for the purpose of inducing him to make the "life-changing decision" to purchase the DDM4v7.

f. That is exactly what happened here. Daniel Defense made this offer to sell with the intention of inducing the Shooter to accept the offer once he turned eighteen and thereby purchase the DDM4v7.

292.    The terms of the offer were clear and definite.

a. The offer was addressed to the Shooter specifically ("Hi Salvador, are you on the fence?");

b. It identified the specific firearm that was being offered to the Shooter ("Your DDM4®v7® is ready in your cart!");

c. It identified and linked to the DDM4v7 that the Shooter had already added to his cart;

Copy from re:SearchTX

    d.   It identified the price and quantity (one DDM4v7 rifle); and

    e.   It included the specific means of acceptance: click the "RETURN TO CART" button and checkout.

293.    Daniel Defense clearly and definitely communicated the essential terms of the offer to the Shooter through this email, such that with an expression of the Shooter's acceptance, there would be complete and definite agreement on all essential details. Daniel defense was "ready" to complete the offered purchase. All the Shooter had to do was click the provided "RETURN TO CART" button and checkout.

294.    Indeed, Daniel Defense's own website privacy policy states that it would use the "personal information" of website visitors to send, inter alia, "offers." Daniel Defense knew and was aware:

    a.   that its marketing was attractive to children under the age of eighteen, especially adolescent boys;

    b.   that its marketing would have the effect of (and was intended to) draw viewers of the marketing to Daniel Defense's website;

    c.   that some of the visitors to its website would be children under the age of eighteen;

    d.   that it had and still has absolutely no age-verification measures on its website to dissuade children under the age of eighteen from visiting the website, interacting with it, signing up for the newsletter or an account, adding firearms to their shopping cart, or receiving offer-to-sell emails from Daniel Defense;

    e.   that children under the age of eighteen could and would sign up for Daniel Defense's email newsletter, create an account, and add firearms to their shopping cart;

    f.   that in sending targeted offers to sell to website visitors who provided their email addresses and added firearms to their shopping cart, Daniel Defense would be sending – and had in fact sent – offers to sell to children under the age of eighteen;

    g.   that all of the above circumstances existed and still exist; and

71

Copy from re:SearchTX

      h.   that the above acts and omissions were and are reasonably certain to result in Daniel Defense making offers to sell firearms to adolescents younger than eighteen years of age, including the Shooter.

295.    Upon information and belief, Daniel Defense knew and was aware that the Shooter was below the age of eighteen when it sent him a targeted offer to sell him the DDM4v7.

296.    Upon information and belief, Daniel Defense's own internal data categorized the shooter as someone under age eighteen.

297.    Daniel Defense collects detailed data on its customers. For example, this data is detailed enough to reveal the political affiliations of its customers. In his testimony before the House Committee on Oversight and Reform, Marvin Daniel testified that "[o]ur internal data shows us ... that less than 20 percent of those new gun owners who have never owned a gun before are Republicans ...."

298.    As one example, the Daniel Defense website privacy policy states that it uses "cookies" to "collect information" from website visitors. The privacy policy states that the cookies it uses include "social media cookies" "set by a range of social media services that we have added to the site" that are "capable of tracking your browser across other sites and building up a profile of your interests." The Privacy policy also states that Daniel Defense uses "targeting cookies" set by "advertising partners" that can "build a profile of your interests" and are "based on uniquely identifying your browser and internet device."

299.    Upon information and belief, the "internal data" that Daniel Defense collects on its customers includes customer age and categorized the Shooter as under the age of eighteen when Daniel Defense illegally offered to sell him the DDM4v7.

300.    Additionally, Facebook and Instagram and other social media platforms collect age information from enormous swaths of internet users, including anyone who has a Facebook or Instagram account – both of which the Shooter had.

72

Copy from re:SearchTX

301.     In addition to collecting age information directly, Facebook and Instagram collect age and other demographic information from "partners, measurement vendors, marketing vendors, and other third parties," including Google, Amazon, Salesforce, and public records.

302.     Facebook and Instagram share demographic information, including age information, with businesses that use their advertising features. And, upon information and belief, Daniel Defense has used Instagram and Facebook for paid advertising. Meta's Ad Library – which keeps records of paid advertisements on Instagram and Facebook – lists Daniel Defense as an advertiser on both platforms.

303.     As a paid advertiser, Daniel Defense was eligible to receive age information regarding Instagram and Facebook users.

304.     Upon information and belief, Daniel Defense did receive that information from Instagram and Facebook and was made aware that children under the age of eighteen were viewing and interacting with Daniel Defense ads.

305.     In testimony before House of Representatives Committee on Oversight and Reform on July 27, 2022, Marvin Daniel testified, "[w]e abide by all the laws" and that Daniel Defense has "a great system of making sure that ... everything is legal."

306.     That was false.

307.     Contrary to that testimony, Daniel Defense does not abide by all the laws. In fact, it knowingly and intentionally offered to sell the Shooter's DDM4v7 to him before he turned eighteen.

308.     Nor does Daniel Defense have a "great system of making sure that ... everything is legal." Daniel Defense does nothing to verify that visitors to its website or those who sign up for accounts and receive offers are over age eighteen. Daniel Defense does not even do the bare

Copy from re:SearchTX

minimum – which many firearms sellers do – of including an "age gate" on its website, which asks for visitor's age and prohibits those who are under eighteen from visiting the website.

309.    Nor does Daniel Defense implement more effective age-verification measures, such as requiring customers to show an I.D. Again, other companies in the firearms industry implement this measure. In fact, the Shooter was prevented from purchasing over 1,500 rounds of ammunition on May 16, 2022 from ammo.com because ammo.com had a policy that it would not sell ammunition to anyone younger than twenty-one and it requires customers to present an I.D. when making an online purchase. The Shooter's I.D. showed that he was eighteen, so ammo.com cancelled his order.

310.    Daniel Defense chooses not to implement any age-verification measures because what happened with the Uvalde Shooter is exactly what it intends. It intends for children under the age of eighteen to visit its website and receive targeted offers to sell them specific firearms.

**G.    Minutes After Turning Eighteen, the Shooter Accepts Daniel Defense's Offer to Sell**

311.    The same day that the Shooter received Daniel Defense's email offering to sell him "Your DDM4v7," the Shooter logged into his bank's website and checked the amount of money in his account.

312.    The Shooter then opened the "Calculator" app on his iPhone to, upon information and belief, calculate whether he was on track to acquire the funds he needed to purchase the DDM4v7.

313.    That same day, the Shooter googled "till may 23" and visited a website showing a countdown timer to May 23, 2022.

314.    On May 4, 2022, the Shooter created a note on his iPhone that stated only "Ask your school about me 😂😂".

74

315.    On May 10, 2022, the Shooter took a screenshot of his account summary page on his bank's website, showing that he had $5,127.78 in his account.

316.    That same day, the Shooter created a note on his iPhone that stated only "Ima be all over the news in 12 days."

317.    On May 12, 2022, the Shooter visited a website that displayed a countdown timer to May 16, 2022. The shooter knew that May 16 was only four days away. Upon information and belief, he created the countdown timer out of excitement and anticipation for being able to accept Daniel Defense's offer to purchase his DDM4v7 that was "ready in [his] cart".

318.    On May 13, 2022, the Shooter sent an Instagram message to a contact saying, "10 more days." When the contact responded, "are you gonna shoot up a school or something[?]" the Shooter answered, "No…. Stop asking me dumb question …. You'll see."

319.    The shooter turned eighteen on May 16, 2022. Just minutes after midnight on May 16, he accepted Daniel Defense's offer to sell him the DDM4v7 that was "ready" and waiting for him in his cart. At 12:23 a.m. on May 16, 2022, Daniel Defense sent the Shooter a confirmation email thanking him for his purchase of the DDM4v7. The total purchase price was $2,024.28.

320.    The Shooter purchased a black DDM4v7, like the version of the DDM4v7 shown on the Call of Duty: Modern Warfare loading screen.

321.    The Shooter's DDM4v7 would be shipped to Oasis Outback, a Uvalde outdoor outfitter and weapons retailer, where the Shooter would be able to pick it up.

322.    At 9:23 a.m. on May 16, 2022, the Shooter received a confirmation email from OpticsPlanet.com, confirming his order of 1,740 rounds of Hornady Frontier 5.56mm, 75 grain, boat-tail hollow-point ammunition. The total purchase price was $1,761.50. It would take 58 fully loaded, 30-round magazines, to hold this much ammunition.

75

Copy from re:SearchTX

323.    In the days after ordering the DDM4v7, the Shooter repeatedly returned to Daniel Defense's webpage for the DDM4v7, and also repeatedly checked his order status. He could not wait to receive the DDM4v7.

324.    On May 16, 2022 – the day he turned eighteen – the Shooter went to Oasis Outback. He went back on May 17, 2022, and purchased a Smith & Wesson AR-15 for $1,081.42. He returned again on Wednesday, May 18, 2022, and purchased 375 rounds of M193, a 5.56mm 55-grain round of ammunition with a full metal jacket.

325.    By that afternoon, the Shooter had all the firepower he could possibly have needed to carry out a mass shooting. He had a Smith & Wesson AR-15, 375 rounds of ammunition, and sixty 30-round magazines.

326.    A typical combat load of ammunition for a rifleman in the U.S. military is 210 rounds of 5.56mm NATO ammunition carried in seven 30-round magazines. Contrastingly, the Shooter had enough rounds of 5.56mm NATO ammunition to load more than twelve 30-round magazines. But the Shooter was not going into combat, he was going to murder innocent children and their teachers.

327.    Despite having more firepower than he could possibly need, the Shooter needed something else. In the words of Daniel Defense, he needed a "totally murdered out" weapon. He needed "a force to be reckoned with." He needed a weapon optimized to "hunt" humans. He needed the weapon he had been "lusting over." He needed his Daniel Defense DDM4v7. And so he waited.

328.    As he waited, he repeatedly checked and re-checked the UPS tracking page for his DDM4v7. On Friday, May 20, 2022 at 10:59 a.m., the Shooter received an email from UPS saying that his DDM4v7 had arrived at Oasis Outback. Seven minutes later, the Shooter called Oasis Outback. The Shooter went to Oasis Outback to pick up his DDM4v7.

76

Copy from re:SearchTX

329.    While he was there, the Shooter had Oasis Outback install the EOTech combat sight on his DDM4v7. To work, the sight needs to be mounted properly and at the correct position on the firearm. Upon information and belief, the Shooter, who had never before fired a firearm in real life or properly mounted a sight on one, did not feel able to mount the EOTech sight on his own.

330.    The Shooter retuned home with his new DDM4v7 and began sending pictures of it to social media contacts.

331.    The next day, Saturday May 21, 2022, the Shooter googled "how many days till may 24". He knew May 24 was only three days away. He could not wait to use his DDM4v7 to live out the twisted fantasy that Daniel Defense had encouraged in him by offering to sell him the DDM4v7.

332.    On Sunday May 22, 2022, the Shooter googled "how many hours till may 24 11am".

333.    On Monday May 23, 2022, at 11:49 a.m., the Shooter googled "how long until 11am tomorrow."

334.    That afternoon, at approximately 4:56 p.m., the Shooter's order of additional ammunition from OpticsPlanet.com was delivered to him.

335.    At 11:13 p.m. on May 23, 2022, the Shooter texted an acquaintance: "I have something outside In the back of the house … And I can't bring it inside till I make sure my grandma is asleep … I don't want her to see it."  Later, the Shooter texted the acquaintance: "I'm going to bed I already got the thing right next to me." The "thing" was his DDM4v7. The Shooter wanted to spend the night before the shooting with his DDM4v7.

## VIII.   The Morning of May 24, 2022

336.    Ten-year old A.G.R. was one of Plaintiff Gallegos' three daughters: A.G.R. had an identical twin sister and another sister, two years her senior. A.G.R. was a bright student who

77

Copy from re:SearchTX

enjoyed school, music, and dancing. A.G.R. and her cousin, J. C., were in the same fourth grade class in Room 111 with teacher Arnulfo Reyes.

337.    On the morning of Tuesday, May 24, 2022, Robb Elementary School students gathered grade by grade for end of year awards assemblies to celebrate the year's hard work. The fourth-grade assembly was held at about 10:30 a.m. Proud parents in the audience watched as their children received honor roll certificates and other class awards. After the ceremony, students posed for photos. A.G.R.'s cousin blew her dad a kiss goodbye in the hallway after the assembly.

338.    The fourth-grade teachers led their students back to the classrooms lining the hallways of the West building. Teacher Arnulfo Reyes walked with his eleven students back to Classroom 111. Teachers Eve Mireles and Irma Garcia took their nineteen students back to Classroom 112. Like most other classrooms in the building, Classrooms 111 and 112 shared a double-width interior door.

339.    In Classroom 111, the students went back to watching *The Addams Family* while Mr. Reyes did some work at his desk. They had started watching the movie earlier that morning before the assembly. In Classroom 112, teachers Eva Mireles and Irma Garcia and their nineteen students were watching *Lilo and Stitch*.

### IX. The Shooter Uses His DDM4v7 to Live Out the Fantasy Daniel Defense Groomed Him for: A Mass Shooting

340.    At approximately 11:21 a.m. on May 24, 2022, the Shooter shot his grandmother in the head. The shooter then messaged a contact on Instagram: "I just shot her in her head ... Ima go to a elementary school and shoot it up ... Rn rn !! ... You'll hear the news ..."

341.    The shooter stole his grandmother's truck and began to drive toward Robb Elementary School, which was located just blocks away. As the Shooter approached Robb Elementary, he lost control of the truck and crashed into a ditch just outside of the school grounds.

Copy from re:SearchTX

The shooter left the crash scene and began to approach Robb Elementary.

342.   He took with him his Daniel Defense DDM4v7 rifle equipped with the EOTech holographic battle sight, his Hell-Fire Gen 2 snap-on trigger system, and a backpack filled with magazines loaded with 5.56mm ammunition.

343.   As the Shooter approached the school, he began firing his DDM4v7. He fired three barrages into the exterior walls and windows of the school.

344.   The Shooter entered the school and approached Classrooms 111 and 112. The Shooter had attended fourth grade – and been bullied – in classroom 111. Now he would exact his twisted idea of revenge.

345.   As the Shooter approached classrooms 111 and 112, he opened fire with his "murdered out" DDM4v7. After shooting into the classrooms from the hallway, the Shooter entered either Classroom 111 or 112 and continued to fire. The Shooter fired over 100 rounds in the next 2.5 minutes.

346.   Classrooms 111 and 112 were connected by internal doors. The Shooter used these doors to move between the classrooms.

347.   Armed with his DDM4v7, the EOTech holographic battle sight, and the Hell-Fire Gen 2 snap-on trigger system, the Shooter murdered nineteen fourth-grade students and two teachers.

348.   In classroom 112, the Shooter said, "It's time to die," clearly relishing the moment and his life-or-death power over everyone in the room. He approached one of the teachers in classroom 112, told her, "good night," and shot her in the head.

349.   In Classroom 111, the students had hidden under a table so that they wouldn't be visible from the doorway. Teacher Reyes turned around and saw the Shooter. The Shooter fired at

79

Copy from re:SearchTX

him.  Reyes couldn't feel his arm, and fell to the floor, face down. The Shooter fired under the table, where children were attempting to hide. The other teacher attempted to protect her students with her body. She stood in front of the children as the Shooter fired.

350.    The Shooter kicked the lifeless bodies of his victims as they lay on the floor. He wrote "LOL," meaning "laugh out loud," on a classroom whiteboard using the blood of his victims.

351.    The Shooter's rampage was beyond brutal. He did not just kill students and teachers, he displayed the cruelty, the sick sense of humor, and the fetishization of violence emphasized in the marketing of Daniel Defense, EOTech, and Firequest. They had sold him this fantasy. He embraced it. The result was the deadliest school shooting in Texas history and unimaginable suffering for the Plaintiff.

## X.    CAUSES OF ACTION

### A.    Negligence Against Defendant Daniel Defense

352.    Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

353.    This is an action in which Daniel Defense knowingly violated Texas Penal Code § 46.06(a)(2), which is a state statute applicable to the sale and marketing of the DDM4v7, and that violation was a proximate cause of the harm for which relief is sought. Accordingly, the Plaintiff's entire action against Daniel Defense is exempt from any immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903.

354.    Defendant Daniel Defense was subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury.

355.    Defendant Daniel Defense had a duty to exercise reasonable care in selling, offering to sell, marketing, and shipping its firearms, including AR-15-style rifles and the DDM4v7, and

80

Copy from re:SearchTX

to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others. Daniel Defense's acts or omissions of negligence include, without limitation, one or more of the following:

    a. encouraging the illegal and dangerous misuse of its AR-15-style rifles through its marketing;

    b. marketing its AR-15-style rifles in a manner to suggest or imply that civilians, including the Shooter, can use Daniel Defense weapons for offensive combat-like missions, to assert dominance, and/or to exact revenge;

    c. marketing its AR-15-style rifles in a manner to appeal to the thrill-seeking and/or impulsive tendencies of susceptible teens, including the Shooter, who are attracted to violence and/or military fantasies;

    d. extending an intentional and/or knowing offer to sell the DDM4v7 to the Shooter when he was under the age of eighteen;

    e. failing to include any age-verification measures on its website and/or its targeted offers to sell firearms; and/or

    f. selling the DDM4v7 to the Shooter.

356.    Each of the above acts or omissions, whether taken singularly or in any combination, was a proximate cause of the Plaintiff's injuries. Each inspired and encouraged the Shooter to carry out the shooting and validated and preyed on his desire for dominance, notoriety, and revenge. It increased the likelihood the shooting would occur, amplified the lethality of the assault, and increased the risk that A.G.R. would be shot and seriously injured or killed.

**B.**     **Negligence Per Se against Defendant Daniel Defense**

357.    Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

358.    Daniel Defense's extension of an intentional and knowing offer to sell the DDM4v7 to the Shooter when he was under the age of eighteen violated Texas Penal Code § 46.06(a)(2).

359.    The Plaintiff and A.G.R. are within the class of persons that Texas Penal Code

81

§ 46.06(a)(2) is intended to protect and their injuries are of the type that the statute was designed to prevent.

360.    Daniel Defense violated Texas Penal Code § 46.06(a)(2) without excuse.

361.    Accordingly, this cause of action is exempt from any immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903.

### C.    Aiding and Abetting the Wrongful Conduct of Defendant EOTech against Defendant Daniel Defense

362.    Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

363.    Daniel Defense knew that the acts and omissions of Defendant EOTech, as described herein, constituted illegal, wrongful, and/or tortious conduct that increased the likelihood and severity of a mass shooting.

364.    Daniel Defense rendered substantial assistance and/or encouragement to EOTech's illegal, wrongful, and/or tortious acts and omissions in, without limitation, one or more of the following ways:

   a.   encouraging the illegal and dangerous misuse of its AR-15-style rifles equipped with EOTech holographic sights;

   b.   marketing its AR-15-style rifles equipped with EOTech holographic sights in a manner to suggest or imply that civilians can use this combination for offensive combat-like missions, to assert dominance, and/or to exact revenge; and/or

   c.   marketing its AR-15-style rifles equipped with EOTech holographic sights in a manner to appeal to the thrill-seeking and/or impulsive tendencies of susceptible teens, including the Shooter, who are attracted to violence and/or military fantasies.

365.    Daniel Defense was generally aware of its role in the overall illegal, wrongful, and/or tortious activity of EOTech.

366.    Daniel Defense knowingly and substantially assisted EOTech's illegal, wrongful, and/or tortious conduct, as described herein.

82

Copy from re:SearchTX

367.     Each of the above acts or omissions, whether taken singularly or in any combination, was a proximate cause of the Plaintiff's injuries. Daniel Defense's substantial assistance and/or encouragement to EOTech's wrongful conduct increased the likelihood the shooting would occur, amplified the lethality of the assault, and increased the risk that A.G.R. would be shot and seriously injured or killed.

**D.     Aiding and Abetting the Wrongful Conduct of Defendant Firequest against Defendant Daniel Defense**

368.     Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

369.     Daniel Defense knew that the acts and omissions of Defendant Firequest, as described herein, constituted illegal, wrongful, and/or tortious conduct that increased the likelihood and severity of a mass shooting.

370.     Daniel Defense rendered substantial assistance and/or encouragement to Firequest's illegal, wrongful, and/or tortious conduct in by encouraging and/or marketing the use of Daniel Defense AR-15-style rifles to unleash automatic fire, thereby encouraging and/or promoting the use of Firequest's illegal trigger systems, including the Hell Fire Gen 2 snap-on trigger system.

371.     Daniel Defense was generally aware of its role in the overall illegal, wrongful, and/or tortious activity of Firequest.

372.     Daniel Defense knowingly and substantially assisted Firequest's illegal, wrongful, and/or tortious activity, as described herein.

373.     Each of the above acts or omissions, whether taken singularly or in any combination, was a proximate cause of the Plaintiff's injuries. Daniel Defense's substantial assistance and/or encouragement to Firequest's wrongful conduct increased the likelihood the shooting would occur,

83

Copy from re:SearchTX

amplified the lethality of the assault, and increased the risk that Plaintiff (A.G.R.) would be shot, be inured, suffer mental anguish, or be killed.

**E.     Gross Negligence against Defendant Daniel Defense**

374.    Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

375.    Viewed objectively from Daniel Defense's standpoint, the acts and omissions of Daniel Defense, whether taken singularly or in any combination, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

376.    Daniel Defense had actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

377.    Accordingly, Plaintiff seeks exemplary damages against Defendant Daniel Defense under Texas Civil Practice and Remedies Code § 41.003 et. seq.

**F.     Negligence against Defendant EOTech**

378.    Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

379.    The Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903 does not apply to any of the Plaintiffs' claims against EOTech because the EOTech holographic combat sight is not a "qualified product" under the Protection of Lawful Commerce in Arms Act, 15 U.S.C.

380.    §§ 7901-7903, because it is not a "firearm," "ammunition," or "a component part of a firearm or ammunition," as those terms are used in 15 U.S.C. §§ 7901-7903.

381.    Additionally, the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903 does not apply to any of the Plaintiffs' claims against EOTech because EOTech is not a "manufacturer," "seller," or "trade association," as those terms are used in 15 U.S.C. §§ 7903,

84

Copy from re:SearchTX

including in the definition of "qualified civil liability action."

382.    Defendant EOTech was subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury.

383.    Defendant EOTech had a duty to exercise reasonable care in selling, offering to sell, marketing, and shipping its holographic battle sights, including the sight used by the Shooter, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others. EOTech's acts or omissions of negligence include, without limitation, one or more of the following:

a.    selling a holographic combat sight designed to target human beings on the battlefield to a civilian purchaser under the age of eighteen;

b.    failing to include any age-verification measures on its website or in its checkout process;

c.    marketing its holographic battle sights in a manner attractive to civilian purchasers and/or to teen boys under the age of eighteen;

d.    marketing its holographic battle sights in a manner to suggest or imply that civilians can and/or should use EOTech battle sights for offensive combat-like missions; and/or

e.    marketing its EOTech battle sights in a manner to appeal to the thrill-seeking and/or impulsive tendencies of susceptible teens, including the Shooter, who are attracted to violence and/or military fantasies.

384.    Each of the above acts or omissions, whether taken singularly or in any combination, was a proximate cause of the Plaintiff's injuries. Each of the above acts or omissions inspired and encouraged the Shooter to carry out the shooting and validated and preyed on his desire for dominance, notoriety, and revenge. It increased the likelihood the shooting would occur, amplified the lethality of the assault, and increased the risk that A.G.R. would be shot, be injured, suffer mental anguish, or be killed.

85

Copy from re:SearchTX

G.   **Aiding and Abetting the Wrongful Conduct of Defendant Daniel Defense against Defendant EOTech**

385.   Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

386.   EOTech knew that the acts and omissions of Defendant Daniel Defense, as described herein, constituted illegal, wrongful, and/or tortious conduct that increased the likelihood and severity of a mass shooting.

387.   EOTech rendered substantial assistance and/or encouragement to Daniel Defense's illegal, wrongful, and/or tortious acts and omissions in, without limitation, one or more of the following ways:

   a.   encouraging the illegal and dangerous misuse of its holographic sights on Daniel Defense's AR-15-style rifles;

   b.   marketing its holographic sights attached to Daniel Defense's AR-15-style rifles in a manner to suggest or imply that civilians can use this combination for offensive combat-like missions, to assert dominance, and/or to exact revenge; and/or

   c.   marketing its holographic sights attached to Daniel Defense's AR-15-style rifles in a manner to appeal to the thrill-seeking and/or impulsive tendencies of susceptible teens, including the Shooter, who are attracted to violence and/or military fantasies.

388.   EOTech was generally aware of its role in the overall illegal, wrongful, and/or tortious activity of Daniel Defense.

389.   EOTech knowingly and substantially assisted Daniel Defense's illegal, wrongful, and/or tortious conduct, as described herein.

390.   Each of the above acts or omissions, whether taken singularly or in any combination, was a proximate cause of the Plaintiff's injuries. EOTech's substantial assistance and/or encouragement to Daniel Defense's wrongful conduct increased the likelihood the shooting would occur, amplified the lethality of the assault, and increased the risk that Plaintiff would be shot and seriously injured or killed.

Copy from re:SearchTX

391.     The Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903 does not apply to any of the Plaintiff's claims against EOTech because the EOTech holographic combat sight is not a "qualified product" under the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903, because it is not a "firearm," "ammunition," or "a component part of a firearm or ammunition," as those terms are used in 15 U.S.C. §§ 7901-7903.

**H.     Gross Negligence against Defendant EOTech**

392.     Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

393.     Viewed objectively from EOTech's standpoint, the acts and omissions of EOTech, whether taken singularly or in any combination, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

394.     EOTech had actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

395.     Accordingly, Plaintiff seeks exemplary damages against Defendant EOTech under Texas Civil Practice and Remedies Code § 41.003 et. seq.

**I.     Negligence against Defendant Firequest**

396.     Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

397.     The Hell-Fire Gen 2 snap-on trigger system is not a "qualified product" under the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903, because it is not a "firearm," "ammunition," or "a component part of a firearm or ammunition," as those terms are used in 15 U.S.C. §§ 7901-7903. Accordingly, the Protection of Lawful Commerce in Arms Act does not apply to the Plaintiff's causes of action against Firequest.

87

Copy from re:SearchTX

398.    Even if the Hell-Fire Gen 2 snap-on trigger system were a "qualified product" under the Protection of Lawful Commerce in Arms Act – and it is not – this is an action in which Firequest knowingly violated Texas Penal Code § 46.05(a)(1)(B) and/or 18 U.S.C. §§ 922(a)(4), (b)(4), and (o)(1), which are state and federal statutes applicable to the sale or marketing of the Hell-Fire Gen 2 snap-on trigger system, and each violation was a proximate cause of the harm for which relief is sought. Accordingly, the Plaintiff's entire action against Firequest is exempt from any immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903.

399.    Defendant Firequest was subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury.

400.    Defendant Firequest had a duty to exercise reasonable care in manufacturing, selling, offering to sell, marketing, and shipping its Hell-Fire Gen 2 snap-on trigger system, including the Hell-Fire Gen 2 snap-on trigger system used by the Shooter, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others. Firequest's acts or omissions of negligence include, without limitation, one or more of the following:

    a.   selling a Hell-Fire Gen 2 snap-on trigger system to the Shooter;

    b.   marketing its Hell-Fire Gen 2 snap-on trigger system to civilians, including the Shooter;

    c.   marketing its Hell-Fire Gen 2 snap-on trigger system as intended for combat; and/or

    d.   marketing its Hell-Fire Gen 2 snap-on trigger system in a manner appealing to individuals intending to commit mass shootings.

401.    Each of the above acts or omissions, whether taken singularly or in any combination, was a proximate cause of the Plaintiff's injuries. Each of the above acts or omissions amplified the lethality and rapidity of the assault and increased the risk that Plaintiff would be shot and seriously injured or killed and was thus a substantial factor in causing Plaintiff's injuries.

88

Copy from re:SearchTX

402.     Additionally, Firequest supplied the Hell-Fire Gen 2 snap-on trigger system for use by the Shooter when Firequest knew, or reasonably should have known, that the Shooter was likely to use the product in a manner involving unreasonable risk of physical injury to himself or others.

403.     The Shooter did use the Hell-Fire Gen 2 snap-on trigger system in a manner involving unreasonable risk of physical injury to himself or others.

404.     Accordingly, and for this additional reason, Plaintiff's claim against Firequest for supplying the Hell-Fire Gen 2 snap-on trigger system to the Shooter is exempt from any immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903.

**J.     Negligence Per Se against Defendant Firequest**

405.     Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

406.     Firequest's manufacturing, sale, and transporting of a Hell-Fire Gen 2 snap-on trigger system to the Shooter violated Texas Penal Code § 46.05(a)(1)(B).

407.     The Plaintiff is within the class of persons that Texas Penal Code § 46.05(a)(1)(B) is intended to protect and their injuries are of the type that the statute was designed to prevent.

408.     Firequest violated Texas Penal Code § 46.05(a)(1)(B) without excuse.

409.     Accordingly, this cause of action is exempt from any immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903.

**K.     Negligence Per Se against Defendant Firequest**

410.     Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

411.     Firequest's manufacturing, sale, and transporting of a Hell-Fire Gen 2 snap-on trigger system to the Shooter violated 18 U.S.C. §§ 922(a)(4), (b)(4), and (o)(1).

89

Copy from re:SearchTX

412.     The Plaintiff is within the class of persons that 18 U.S.C. §§ 922(a)(4), (b)(4), and (o)(1) are intended to protect and their injuries are of the type that the statutes were designed to prevent.

413.     Firequest violated 18 U.S.C. §§ 922(a)(4), (b)(4), and (o)(1) without excuse.

414.     Accordingly, this cause of action is exempt from any immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903.

**L.     Strict Liability for Abnormally Dangerous Activity against Defendant Firequest**

415.     Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

416.     In providing the Hell-Fire Gen 2 snap-on trigger device to civilian purchasers, Firequest carried on an abnormally dangerous activity.

417.     The harm the Plaintiff suffered was the kind of harm, the possibility of which made Firequest's activity abnormally dangerous.

418.     Firequest's activity of providing the Hell-Fire Gen 2 snap-on trigger device to civilian purchasers was a proximate cause of the Plaintiff's injuries. It amplified the lethality and rapidity of the assault and increased the risk that Plaintiff would be shot and seriously injured or killed and was thus a substantial factor in causing Plaintiff's injuries.

**M.     Gross Negligence against Defendant Firequest**

419.     Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

420.     Viewed objectively from Firequest's standpoint, the acts and omissions of Firequest, whether taken singularly or in any combination, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

Copy from re:SearchTX

421.    Firequest had actual, subjective awareness of the risk involved, but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of others.

422.    Accordingly, Plaintiff seeks exemplary damages against Defendant Firequest under Texas Civil Practice and Remedies Code § 41.003 et. seq.

**N.    Negligence against Defendant Oasis Outback**

423.    Oasis Outback is a licensed seller of firearms. The Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7903(5)(B), defines "negligent entrustment" as "the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others."

424.    The Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7903(5)(A)(ii), provides that "an action brought against a seller for negligent entrustment" – in other words, for conduct that meets the definition of "negligent entrustment" under the act – is exempt from any immunity under the act.

425.    Plaintiffs have pleaded facts establishing that Oasis Outback's conduct constituted "negligent entrustment" under the Protection of Lawful Commerce in Arms Act.

426.    Accordingly, this cause of action is exempt from any immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-7903.

427.    Additionally, the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7903(5)(A) defines "qualified civil liability action" as "a civil action or proceeding … brought by any person against a manufacturer or seller of a qualified product … for damages, punitive damages, … or other relief, resulting from the criminal or unlawful misuse of a qualified product …."

91

Copy from re:SearchTX

428.     Oasis Outback was not a "manufacturer" or "seller" of the EOTech sight used by the Shooter.

429.     Moreover, the EOTech sight is not a "qualified product" under the Protection of Lawful Commerce in Arms Act.

430.     Accordingly, the Plaintiffs' claims against Oasis Outback for negligence and gross negligence related to the EOTech sight are not a qualified civil liability action under the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7903(5)(A), and no immunity under the act applies to those claims.

431.     Defendant Oasis Outback had a duty to exercise reasonable care in supplying firearms, selling firearms, transferring firearms, installing firearms accessories, and selling or supplying ammunition, and to refrain from any activity creating reasonably foreseeable risks of injury to others.

432.     Despite his youth and having turned eighteen just days before, the Shooter spent thousands of dollars on multiple guns and large quantities of ammunition at and through Oasis Outback over a four-day period, and requested that a state-of-the-art, military combat sight be installed on the DDM4v7, all of which was so unusual that it caused Oasis Outback's owner to question the Shooter as to where he got the money.

433.     Other patrons at the store noticed the Shooter acting unusual, nervous, and alarming during these repeat visits. He dressed in all black and, as one customer described him, he looked "odd" and "like one of those school shooters." Other customers described the Shooter as "very nervous looking" and giving off "bad vibes."

434.     Oasis Outback had the right to refuse service to anyone.

435.     Oasis Outback supplied the Shooter with the Daniel Defense DDM4v7, a Smith &

Copy from re:SearchTX

Wesson AR-15, and 375 rounds of ammunition.

436.   Oasis Outback installed the EOTech holographic combat sight for the Shooter on the Daniel Defense DDM4v7 and, upon information and belief, Oasis Outback "zeroed" or otherwise adjusted the EOTech holographic combat sight for deadly accuracy. Oasis Outback knew and reasonably should have known that the Shooter was likely to use each of the items described above in a manner involving unreasonable risk of physical injury to himself and others.

437.   The Shooter did use each of the items described above in a manner involving unreasonable risk of physical injury to himself and others.

438.   Defendant Oasis Outback breached its duty to exercise reasonable care by:

a.   installing the EOTech holographic combat sight on the DDM4v7;

b.   "zeroing" or otherwise adjusting the EOTech holographic combat sight for the Shooter;

c.   supplying the Daniel Defense DDM4v7 to the Shooter;

d.   supplying a Smith & Wesson AR-15 to the Shooter; and/or

e.   supplying ammunition to the Shooter.

439.   Each of the above acts or omissions, whether taken singularly or in any combination, was a proximate cause of the occurrence and of the injuries to the Plaintiffs. Each increased the likelihood the shooting would occur, amplified the lethality of the assault, and increased the risk that Plaintiffs would be shot, be injured, suffer mental anguish, or be killed.

**O.    Gross Negligence against Defendant Oasis Outback**

440.   Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

441.   Viewed objectively from Oasis Outback's standpoint, the acts and omissions of Oasis Outback, whether taken singularly or in any combination, involved an extreme degree of

93

Copy from re:SearchTX

risk, considering the probability and magnitude of the potential harm to others.

442.    Oasis Outback had actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

443.    Accordingly, Plaintiff seeks exemplary damages against Defendant Oasis Outback under Texas Civil Practice and Remedies Code § 41.003 et. seq.

## XI.    DAMAGES

444.    Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

445.    As a result of the causes of action above, the Plaintiff—as well as her whole community—has suffered a degree of loss, pain, anguish, and destruction of herlife beyond understanding.  For each of those causes of actions, Plaintiff seeks all available damages at law, including the following:

### A.    Survival Damages of Deceased Child

446.    Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

447.    Pursuant to Texas Civil Practice and Remedies Code § 71.021, Plaintiff pleads for her funeral and burial expenses. She pleads as well for the pain and mental anguish for her child that lost her life. This plea includes damages for the conscious physical pain and emotional pain from injuries, the torment and anguish of the fear of impending death, and the suffering for minor decedent, A.G.R.

### B.    Wrongful Death Beneficiary Damages of Surviving Parents

448.    Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

Copy from re:SearchTX

449.     Pursuant to Texas Civil Practice and Remedies Code § 71.002, the surviving natural parent of the above deceased child is a wrongful death beneficiary asserting claims arising out of the death of her child proximately caused by the foregoing claims. As such, the parent below asserts claims for all recoverable damages as wrongful death beneficiary, including the following claims:

    a.  Pecuniary loss sustained in the past for the loss of the care, maintenance, support, services, advise, counsel, and reasonable contributions of a pecuniary value that the parent in all reasonable probability would have received from her deceased child had she lived;

    b.  Pecuniary loss that, in reasonable probability, will be sustained in the future;

    c.  Loss of companionship and society in the past for the loss of the positive benefits flowing from the love, comfort, companionship, and society that the parent in all reasonable probability would have received from her deceased child had she lived;

    d.  Loss of companionship and society that, in reasonable probability, will be sustained in the future;

    e.  Mental anguish sustained in the past for the emotional pain, torment, and suffering experienced by the parent for the death of her child; and

    f.  Mental anguish that, in all reasonable probability, will be sustained in the future.

450.     Each of the above elements of wrongful death damages is being sought by the Plaintiff Monica M. Gallegos, natural parent of her child decedent, A.G.R.

## C.     Punitive and Exemplary Damages

451.     Plaintiff incorporates and re-alleges the above paragraphs and all subsequent paragraphs as if stated fully here.

452.     The malicious, reckless, and wanton acts and/or omissions of Defendants constituted gross negligence and directly and proximately caused and/or contributed to cause Plaintiff to suffer grave, even terminal, physical and mental harm.

453.     Plaintiff seeks exemplary damages in an amount as allowed by Texas Civil Practice

Copy from re:SearchTX

and Remedies Code § 41.008.

## XII.   REQUEST FOR A JURY TRIAL

454.   Plaintiff requests a trial by jury and has tendered the requisite fee.

## XIII.   PRE-JUDGMENT AND POST-JUDGMENT INTEREST

455.   Plaintiff seeks prejudgment and post-judgment interest at the maximum legal rate.

## XIV.   RULE 193.7 NOTICE

456.   Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, Plaintiff hereby gives notice to Defendants of Plaintiff's intent to use, at trial and/or any hearing, any and all documents produced by any current or previous Defendant in this litigation.

## XV.   PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that the Defendants be cited to appear and answer herein, that this cause be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Plaintiff against Defendants, jointly and severally, for damages in an amount within the jurisdictional limits of the Court; exemplary damages, as addressed to each Defendant per Section 41.006, Chapter 41 of the Texas Civil Practice and Remedies Code, excluding interest, and as allowed by § 41.008, Chapter 41 of the Texas Civil Practice and Remedies Code, together with pre-judgment interest (from the date of injury through the date of judgment) at the maximum rate allowed by law; post-judgment interest at the legal rate, costs of court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

Dated: May 24, 2024                    Respectfully submitted,

                                       RODRIGUEZ TRIAL LAW
                                       231 W. Cypress St.
                                       San Antonio, Texas 78212
                                       Telephone: (210) 777-5555
                                       Fax: (210) 224-0533

96

Copy from re:SearchTX

By:     /s/ FIDEL RODRIGUEZ, JR.
        FIDEL RODRIGUEZ, JR
        State Bar No. 17145500
        Email: fidel@fidrodlaw.com

SYLVAN S. LANG, JR.
State Bar No. 11898700
Email: sylvan@langfirm.com
MEAGAN M. GILLETTE
State Bar No. 24050659
Email:  meagan@langfirm.com
BRIAN M. DENNIS
State Bar No. 24039970
Email: brian@langfirm.com
LANG LAW FIRM, P.C.
Northwest Atrium
11550 IH-10 West, Ste. 273
San Antonio, Texas 78230
Telephone: (210) 479-8899
Fax: (210) 479-0099


ROGELIO M. MUÑOZ
State Bar No. 24044409
Email:  roy@swtexaslaw.com
THE MUÑOZ LAW FIRM
231 S. Getty St.
Uvalde, Texas 78801
Telephone: (830) 278 1150
Fax: (830) 278 1559

**ATTORNEYS MONICA M. GALLEGOS
INDIVIDUALLY AS WRONGFUL
DEATH BENEFICIARY AND
REPRESENTATIVE OF THE ESTATE
OF ANNABELL GUADALUPE
RODRIGUEZ, DECEASED MINOR**

97

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Rozalynn Ramirez on behalf of Fidel Rodriguez Jr
Bar No. 17145500
efile@fidrodlaw.com
Envelope ID: 88135673
Filing Code Description: Petition
Filing Description: Plaintiff's Original Petition
Status as of 5/28/2024 7:07 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Damaris Ramiro | | dramiro@fidrodlaw.com | 5/24/2024 6:07:36 PM | SENT |
| Fidel Rodriguez III | | tres@fidrodlaw.com | 5/24/2024 6:07:36 PM | SENT |
| Fidel Rodriguez Jr | | fidel@fidrodlaw.com | 5/24/2024 6:07:36 PM | SENT |
| Lana Lea | | llea@fidrodlaw.com | 5/24/2024 6:07:36 PM | SENT |
| Rozalynn Ramirez | | efile@fidrodlaw.com | 5/24/2024 6:07:36 PM | SENT |
| Rozalynn Ramirez | | rramirez@fidrodlaw.com | 5/24/2024 6:07:36 PM | SENT |
| Sylvan Stephen Lang | 11898700 | Sylvan@langfirm.com | 5/24/2024 6:07:36 PM | SENT |
| Meagan Gillette | 24050659 | meagan@langfirm.com | 5/24/2024 6:07:36 PM | SENT |
| Brian Dennis | 24039970 | Brian@langfirm.com | 5/24/2024 6:07:36 PM | SENT |
| Evangelina Sanabia | | evangelina@langfirm.com | 5/24/2024 6:07:36 PM | SENT |